THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RONALD McCOMMON, Defendant-Appellant.

First District (Second Division)    No. 78-1678

Opinion filed December 26, 1979.

Howard T. Savage, of Chicago (Howard O. Edmonds, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Paul C. Gridelli, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE PERLIN delivered the opinion of the court:

After a bench trial defendant, Ronald McCommon, was found guilty of solicitation to commit an aggravated battery and was sentenced to three years' probation. Defendant appeals, presenting the following issues for review: (1) whether defendant was proved guilty of solicitation beyond a reasonable doubt; (2) whether defendant was prejudiced by the fact that the State did not call as a witness the intended victim of the battery; (3) whether the trial court erred in refusing to allow defendant to cross-examine a prosecution witness as to the witness' use of narcotics; (4) whether the trial court erred in admitting into evidence a tape recording of a conversation between defendant and two prosecution witnesses; (5)

whether the trial court in reaching its decision relied upon incompetent evidence; and (6) whether the trial court erred in questioning defendant during the State's cross-examination of defendant.

We affirm.

Defendant was charged by three indictments with one count of official misconduct and two counts of solicitation. The indictments charged that on June 1, 1976, defendant, who was at the time a police officer for the city of Evanston, requested and encouraged Joseph Saladino, an investigator with the Cook County State's Attorney's office, to commit an aggravated battery upon Bobby Jones.[1] The following evidence was adduced at trial.

James Gillespie, police captain with the Evanston Police Department, testified that defendant was a police officer for the city of Evanston from May 29, 1973, to October 22, 1976.

Bernard Carey, State's Attorney of Cook County, testified that at approximately 12:55 p.m. on June 1, 1976, he received a telephone call from an Assistant State's Attorney, Frank DeBoni. DeBoni related facts regarding an investigation the office was conducting involving a member of the Evanston Police Department. DeBoni then requested Carey's consent to overhear and record a conversation between such officer and a consenting individual from the office. DeBoni stated to Carey that a crime was about to be committed and that the individual who brought such fact to the State's Attorney's attention would consent to the recording and would wear the electronic recording equipment. DeBoni said the conversation would probably take place that same evening. Carey gave his consent and requested that the conversation be overheard. The authorization was for a 24-hour period provided that the individual gave consent. Carey did not authorize any particular person to wear the equipment but rather authorized the recording of a particular conversation. Frank DeBoni testified to substantially the same facts as Bernard Carey and testified further that Amonda Taylor was the person who had informed the State's Attorney's office of the possibility of a crime beng committed.

Amonda Taylor testified as follows: Taylor had been convicted of sale of controlled substances and conspiracy, and he was presently incarcerated in a Federal institution, the Metropolitan Correctional Center. On May 14, 1976, Taylor was in a courtroom in Evanston, Illinois,

---

[1] Prior to trial defendant filed a motion to suppress all reference to a conversation between defendant, Saladino and Amonda Taylor alleged to have occurred on June 1, 1976, which conversation the State's Attorney's office had electronically recorded. Defendant alleged that the State's Attorney's office did not have proper consent and authorization to record the conversation. After a hearing, the trial court denied the motion to suppress. Defendant also filed a motion to dismiss the indictments, alleging that the grand jury was unduly prejudiced by the State's attorneys. The trial court denied the motion to dismiss.

and he saw defendant. Defendant approached Taylor and said he was in court with regard to a gambling arrest of Bobby Jones. Defendant said he wanted Taylor to sell him some "reefers" and to see if Taylor could set defendant up with someone to do something to Jones. Defendant said he wanted Jones hurt. Defendant was mad because Jones was getting off lightly with arrests and he was tired of Jones making a fool of him. Defendant gave Taylor his phone number. Taylor called defendant later that same day and told defendant that he was checking on people to take care of Jones and that he was going to Springfield for a week and would be in touch. Taylor called defendant on May 15, 1976, and said he was leaving town. Three or four days later Taylor called defendant from Springfield and said he had 10 pounds of marijuana and that he was in touch with some people and would call defendant when he returned to Evanston. On May 23, 1976, defendant called Taylor in Springfield and wanted to know when he could meet the people who would take care of the business with Jones. Taylor told defendant he could meet them the next week. On May 27, 1976, Taylor went to the State's Attorney's office at 2600 South California Avenue, Chicago, and met with Mr. Prendergast and Ms. Peigan. After the meeting, Taylor called defendant and told him they could meet on Tuesday, June 1, 1976. On June 1, 1976, Taylor called defendant and told him to meet Taylor at 7:30 p.m. at the Skokie Hilton. Prior to meeting with defendant, Taylor gave his consent to have the conversation overheard and recorded. Taylor was present for the entire conversation between himself, investigator Saladino and defendant.

On cross-examination Taylor testified that he had been in custody since July 6, 1977, and that he had previously been convicted of conspiracy to defraud and embezzle and was confined on those charges also. On June 1, 1976, Taylor lived in Springfield but he stayed in Evanston and he knew Jones from Evanston because he frequented a social club that Jones operated. Taylor knew Jones 10 or 11 years but did not work for Jones. Taylor talked to Jones on May 31, 1976, but not about the plot against Jones. However, Taylor did tell Jones about the plot on May 14, 1976, after Taylor left court. On June 1, 1976, Taylor met Saladino at approximately 4 p.m. in the cocktail lounge at the Skokie Hilton. Taylor called defendant's residence twice to inform defendant of the arrangements. The conversation between Saladino, Taylor and defendant lasted about 30 to 45 minutes. They began talking in the lounge and then finished outside in Taylor's automobile.

Joseph Saladino, an investigator for the State's Attorney's office in Cook County, testified that between 3:30 and 4 p.m. on June 1, 1976, he went to the Skokie Hilton and met with Amonda Taylor, who had a room in the motel. At approximately 8 p.m. Saladino met with Taylor and

defendant and had a conversation with them in the lounge and in an automobile. Saladino consented to the recording of the conversation and had the recording equipment on his person. After the conversation Saladino removed the recording equipment and inventoried the tape by scratching his initials on the tape wheel and cassette disk, placing the tape in an envelope with his name on it and delivering it to the office at 26th and California. Saladino identified the envelope and cassette tape and tape wheel, and such items were admitted into evidence. The tape was then played in court and transcribed by the court reporter. At the beginning of the tape officer Saladino identified himself and the date, June 1, 1976, and stated that the recording was in relation to the solicitation to commit an aggravated battery or murder against Bobby Jones. The conversation, as transcribed by the court reporter, was, in pertinent part, as follows:

"Other Voice: * * * Ramono says you want this guy Jones chopped, right?

A Voice: I just wanted him bumped aside the head, [expletive deleted].

Other Voice: [Expletive deleted.] You want his legs broken, arms broken, something like that? Something make him wake up. You want me to leave a message?

A Voice: No, no message.

Other Voice: You will take care of that?

A Voice: Right.

Other Voice: So, in other words, you don't want me to kill him, just want me to break his arms, break a leg?

A Voice: Right.

Other Voice: Put him in the hospital?

A Voice: Put him in the hospital where he can rest for a while.
* * *

Other Voice: Okay. Any particular time?

A Voice: As soon as I can come up with this money. I don't know if Armondo [sic] told you, I am not no big [expletive deleted] has a big bunch of money. I am waiting on my check to come from the income tax, that's what I'm planning to use it for.

If I can get some money—good faith—bring it to you and get it to you early, that is what I want to be able to do. I'd rather just pay you the whole thing in one lump sum.
* * *

Other Voice: If I were dealing on the facts—you are a copy [sic]—I didn't even know—that surprises the hell out of me, but I am going to tell you, I am still a little shocked.

Why? Why do you want this guy chopped?

A Voice: When I came on I tried to help the cat, be nice—running the houses—paying off these things.

Other Voice: Who is paying off?

A Voice: The chief. Well, the day I know is I been dealing with his bag man—couple of other spots been paying off—I had some deals with his bag man there.

Anyway, he just don't want to put my hands in the pot and you know—

    \* \* \*

Other Voice: What arm do you want broke?

A Voice: Well—

Other Voice: You are paying.

A Voice: It don't matter. I am ready. I like to pay all my shit off.

Other Voice: Before I do the job?

A Voice: Right, I will give you the money before you do the job because I don't like to have nothing behind me.

Other Voice: You don't have no trouble on you now, right?

A Voice: No.

Other Voice: You are talking about a week, right?

A Voice: Right.

    \* \* \*

Other Voice: I am just here—well, cool—

All right. Let's go. We do the job and we get paid, right?

A Voice: Right.

Other Voice: Okay. That's okay. We got a deal.

A Voice: Okay. Good enough.

Other Voice: We got a deal."

After the tape was played, Saladino testified that the tape truly and accurately portrayed the conversation with Taylor and defendant on June 1, 1976. On cross-examination Saladino testified that to his knowledge Taylor arranged for the motel room and the State's Attorney's office paid for it. Saladino was posing as a Mafia "hit man" during the conversation. Saladino testified that he had the conversation which was played from the tape and defendant had stated that he did not want the job done until he had the money and he would have the money in a week or two. Saladino had no knowledge as to the money defendant had in his possession when he was arrested on June 2, 1976, at 2:30 a.m.

After Saladino's testimony the State rested its case and defendant made a motion for directed verdicts of acquittal. The trial court sustained the motion as to the official misconduct charge.

Defendant then presented the following witnesses. Roosevelt Alexander, an attorney and alderman of the fifth ward in Evanston,

testified that he knew defendant all his life and he formed an opinion as to defendant's reputation in the community. Alexander testified that people in the community thought defendant was a truthful person and he had a good reputation as a peaceful person.

Daniel Moses, a police officer with the Evanston Police Department, testified that in October or November of 1975 he and defendant conducted an investigation of Robert Jones, and in January 1976 Moses arrested Jones. There was a prosecution of Jones in which defendant took part, and in January 1977 Jones was found guilty of being a keeper of a gambling establishment.

Carlos Mitchem, a police officer with the Evanston Police Department, testified that in January 1976 he assisted in the gambling investigation of Bobby Jones and that defendant was also involved in the investigation. On June 2, 1976, at approximately 2:30 to 3 a.m. Mitchem saw Jones in the parking lot of the police station. Jones had been sitting in his car across the street from the police station and when Mitchem went into the parking lot, Jones drove into the lot and said to Mitchem, "Do you know that Ronnie was busted tonight? You're next and Sergeant Erlinson is next for trying to set me up." Erlinson, a police officer, also participated in the gambling raid and arrest of Jones. Mitchem reported the threat to his superiors by interoffice memorandum.

Gayle McCommon, defendant's wife, testified that on June 1, 1976 at approximately 7 p.m. defendant told her he had a meeting involving some undercover police work and involving the syndicate. Defendant said the meeting was in Skokie and that if he was not back within two hours, she should call the police chief. Defendant did not mention the names of the people he was going to meet. Defendant left at 7 p.m. and shortly thereafter Ms. McCommon received a phone call from Taylor. Defendant arrived home at 9 p.m. and they went to bed at 11 p.m. When they went to bed, defendant put his clothes on the valet. At approximately 1:10 a.m. police officers from the Evanston Police Department came to their home and arrested defendant. Defendant put on the same clothes he had worn before going to bed. On cross-examination Ms. McCommon testified that defendant had been disgusted with the man who approached him in court and that defendant was going to investigate. Defendant had been talking about the situation for about three months.

Defendant testified on his own behalf as follows: He was a police officer with the Evanston Police Department from May 29, 1973, to November 1976. In the latter part of 1975 and January 1976 defendant became involved in the investigation of Jones who was operating a gambling institution. On January 22, 1976, defendant and several other officers searched Jones' premises pursuant to a search warrant and they

arrested Jones and 22 other individuals. Two or three weeks after Jones' arrest, defendant was told by one Son Robinson that Jones was going to attempt to set up defendant in some type of illegal action. Defendant reported this to his superiors, Officers Joyce and Logan, by interoffice memorandum on February 2, 1976. Defendant also learned that Jones had possession of police reports that were supposed to be confidential. On April 2, 1976, defendant appeared in court in Evanston as a prosecution witness for Jones' trial, but Jones received a continuance on that day. Defendant saw Taylor in court and had a conversation with him. Taylor approached defendant and began talking about how defendant was unhappy with the way Jones was treated in court. Taylor said he had friends who could administer "street justice" to Jones. Defendant shook his head and did not respond. Defendant did not give Taylor his telephone number. Approximately two or three weeks later Taylor called defendant at his residence and asked if defendant was interested in the matter they had discussed. Defendant replied that he would have nothing to do with it. Approximately one week later, Taylor called defendant at the police station but defendant was out on patrol. Defendant called Taylor, who was in Springfield, and Taylor said he had people to do the job. Approximately two weeks later, on May 27, 1976, Taylor called defendant at home and said he was setting up a meeting for the following Tuesday, June 1, and Taylor was going to introduce defendant to his syndicate friend. The meeting was arranged for June 1, 1976, at the Skokie Hilton at 7 p.m.

Defendant testified further than on June 1, 1976, he went to the Skokie Hilton. Before leaving home defendant told his wife he was in fear of his life and that if anything happened, she should call Chief McHugh. At the hotel defendant went to the lounge and met Taylor and Saladino, who was introduced by Taylor as "a gangster friend." They had a conversation, during which Saladino did most of the talking. Saladino offered to break Jones' arm or leg on credit, and defendant told him not to do it until he could talk to his people and get the money ($500) to pay Saladino. Defendant told them he had no money but was expecting his income tax check within a week. In fact, defendant had cashed his income tax check that day and had $459 with him. Defendant told Saladino he would get back to him. The conversation, which took place in the lounge and in Taylor's car, lasted approximately 30 to 60 minutes and then defendant went home. Defendant went to bed at 11 p.m. but was awakened at approximately 1 a.m. on June 2, 1976, when the police came to his home and arrested him. Defendant put on the same clothes he had worn the night before, and at the police station his personal property was taken from him and he received a receipt. Defendant testified that he was not working on June 1, 1976, but that part of his duties as a police officer

was undercover work in narcotics and gambling investigations. Defendant did not urge, request or encourage Saladino to commit an aggravated battery on Jones.

On cross-examination defendant testified that he did not report to his superior officers before going to the meeting because he did not trust them. After the meeting he did not report the meeting but he intended to file a report the next day and submit it to the Cook County narcotics unit. He did not intend to file a report with the Evanston Police Department because he did not trust anyone at that time. In response to questions by the court, defendant stated that he had suspicions about one sergeant whom he had seen with Jones, and that he had suspicions about the chief and about 100 of 145 police officers in the department. Defendant had suspicions because prior to his joining the force, after gambling raids were conducted, Jones was never arrested. In response to a question by the court, defendant stated that his voice was on the tape recording played in court. Defendant testified that he felt he was in fact being solicited by Taylor and he continued to partake in the plan so he could determine what Taylor was planning to do.

William Logan, captain with the Evanston Police Department, identified an interoffice memorandum dated February 4, 1976, which was submitted by defendant, and he testified that to his knowledge, defendant was not engaged in an investigation of gambling by Bobby Jones at the time the memorandum was submitted. Thomas Joyce, a lieutenant with the Evanston Police Department, testified that in February 1976 defendant gave him the interoffice memorandum previously identified, and he forwarded it to Captain Gillespie. The interoffice memorandum was admitted into evidence at trial, but it is not included in the record on appeal.

Donn Price testified that he was controller of the North Shore Hilton, commonly known as the Skokie Hilton, and he maintained the motel records with respect to reservations and registration of guests. On June 1, 1976, the motel had a guest by the name of Amonda Taylor of Springfield, Illinois, and an individual by the name of Bobby Jones of Evanston, Illinois, made the reservation for Taylor.

William C. McHugh, chief of police of the Evanston Police Department, testified on rebuttal that defendant never worked in an undercover capacity for the department.

Based on the foregoing evidence, the trial court found defendant guilty of solicitation and sentenced defendant to three years' probation.

I.

Defendant initially contends that the State failed to prove him guilty of solicitation beyond a reasonable doubt. Defendant argues that the

evidence did not establish that he had the specific intent that an aggravated battery be committed and that the evidence showed a plot to involve defendant in the commission of an offense rather than defendant's actual commission of an offense.

■■ Section 8—1 of the Criminal Code defines the offense of solicitation as follows:

> "A person commits solicitation when, with intent that an offense be committed, he commands, encourages or requests another to commit that offense." (Ill. Rev. Stat. 1977, ch. 38, par. 8—1.)

It is well established that to convict for solicitation the evidence must show that defendant had the specific intent that the offense be committed. (*People v. Hairston* (1970), 46 Ill. 2d 348, 357, 263 N.E.2d 840, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 2d 136, 91 S. Ct. 1658.) The offense of solicitation is complete when the principal offense is commanded, requested or encouraged with specific intent that the principal offense be committed (*Hairston*, at 357). It is also well settled that intent is a state of mind and may be inferred from the surrounding circumstances since every sane person is presumed to intend all the natural and probable consequences of his actions. *People v. Koshiol* (1970), 45 Ill. 2d 573, 578, 262 N.E.2d 446, *cert. denied* (1971), 401 U.S. 978, 28 L. Ed. 2d 329, 91 S. Ct. 1209.

In the case at bar the trial court found that the recorded conversation showed a specific intent on the part of defendant to have an aggravated battery committed upon Jones. Defendant argues that specific intent is not established because he stated during the conversation that he did not want anything done until he had the money and that he would not have the money for about a week. However, several statements attributed to defendant in the conversation indicate a specific intent to have the offense committed. Defendant stated that he wanted Jones "bumped aside the head" and told Saladino to "Put him in the hospital where he can rest for a while." Although defendant said he did not want the act done for about a week, this statement does not necessarily negate intent to have the act committed (*i.e.*, defendant did not tell Saladino not to do the act, rather he said he wanted it done but not until he paid Saladino). In *People v. Swimley* (1978), 57 Ill. App. 3d 116, 372 N.E.2d 887, *cert. denied* (1978), 439 U.S. 911, 58 L. Ed. 2d 257, 99 S. Ct. 281, defendant was found guilty of solicitation to commit the murder of her husband. The evidence showed that defendant met with an undercover investigator and he recorded a conversation in which defendant stated she wanted her husband "evaporated" and would pay $5,000. Defendant gave the investigator $100 and agreed to pay $400 the next day as a down payment. She also gave the investigator a photograph of her husband and his address. Defendant testified on her own behalf that her son's friend

arranged the meeting and she went because the friend was afraid he would be harmed and that she discouraged the person by not taking much money, by taking old photographs and by insisting on several days notice prior to the killing. The appellate court in *Swimley* found the evidence was sufficient to convict, stating that the transcript of the conversation belied defendant's claim of innocence. In the case at bar, the transcript of the conversation shows that defendant had specific intent that the aggravated battery be committed. At the end of the conversation defendant shows his intent that the plan be carried out by the following:

"Other Voice: We do the job and we get paid, right?

Voice: Right.

Other Voice: Okay. That's okay. We got a deal.

Voice: Okay. Good enough.

Other Voice: We got a deal."

■■ Defendant also contends that evidence showed a plot by Jones to involve defendant in the commission of a crime rather than defendant's intent to commit a crime. Defendant contended that he was investigating Jones and wanted to know why Taylor had been calling defendant. It is well established that when the defendant testifies as to what happened, he must tell a reasonable story or be judged by its improbabilities. (*People v. Sykes* (1977), 45 Ill. App. 3d 674, 359 N.E.2d 897; *People v. Ortiz* (1976), 44 Ill. App. 3d 124, 357 N.E.2d 1270.) The trier of fact may disbelieve defendant's story and is not required to ignore the inference flowing from other evidence. (*Ortiz*, at 129.) The rule is well settled in Illinois that:

" '[W]here a case is tried by the court without a jury, the determination of the credibility of the witnesses and the weight to be accorded their testimony is committed to the trial judge; and, unless it can be said that the court's judgment is found to rest on doubtful, improbable or unsatisfactory evidence, or clearly insufficient evidence, a reviewing court will not substitute its judgment for that of the court below even though evidence regarding material facts is conflicting and irreconcilable. [citation]' [Citation.]" (*People v. Powell* (1978), 72 Ill. 2d 50, 65, 377 N.E.2d 803, *cert. denied* (1979), 440 U.S. 907, 59 L. Ed. 2d 455, 99 S. Ct. 1214.[2]

In the case at bar there are questions of credibility and probability in both the State's case and the defendant's case. The State did not attempt to explain the motel reservation made by Jones, the threat made by Jones to officer Mitchem, or Taylor's relationship with Jones. Defendant testified that he was investigating Jones at the time in question but that he did not

---

[2] In his brief defendant cites the appellate court decision in *Powell* to support his argument that his conviction should be reversed. The appellate court decision was reversed by the supreme court.

inform his superior officers of his investigation or the prearranged meeting because he did not trust his superiors or the police chief. However, defendant stated he was in fear of his life and he told his wife to call the police chief if he did not return home within two hours. Also, defendant stated he did not file a report because he did not trust his superiors, yet in February 1976 he filed a report as to a "threat" from Jones. Although there are questions of credibility and the evidence as to some facts is conflicting and irreconcilable, we cannot conclude that the trial court's judgment rests on clearly insufficient and improbable evidence. The questions raised are matters for the trier of fact, and it is not the function of this court to substitute its judgment for that of the trier of fact. We find that there was a sufficient basis for the trial court's finding that defendant was guilty of solicitation beyond a reasonable doubt.

## II.

Defendant next contends that the State's failure to call Bobby Jones as a witness resulted in prejudice to defendant. Defendant argues that the evidence showed that Jones was involved in a plot to induce defendant to commit a crime and that disputed questions of fact could have been resolved if defendant had the opportunity to cross-examine Jones. The State contends that it is not required to call every witness to a crime and that defendant could have subpoenaed Jones as a witness.

The rule is well settled that the State is not obligated to produce every witness to a crime. (*People v. Jones* (1964), 30 Ill. 2d 186, 190, 195 N.E.2d 698.) Courts have held, however, that when a case turns upon a disputed issue of fact which an available witness could resolve from his unique knowledge of the event and the State chooses not to call that witness to testify, then the trier of fact may infer that the testimony would have been unfavorable to the State. (*People v. Strong* (1961), 21 Ill. 2d 320, 172 N.E.2d 765.) In *Strong*, defendant, who was convicted of unlawfully selling and possessing heroin, raised the defense of entrapment in that a State informer supplied defendant with the narcotics. The court found that only the State informer could refute defendant's testimony and that, while the State was not obligated to call the informer as a witness, the unexplained absence of the informer gave rise to an inference against the State. (21 Ill. 2d 320, 325.) In *People v. Williamson* (1966), 78 Ill. App. 2d 90, 223 N.E.2d 453, *appeal denied* (1967), 35 Ill. 2d 631, and *People v. Bolden* (1978), 59 Ill. App. 3d 441, 375 N.E.2d 898, *appeal denied* (1978), 71 Ill. 2d 610, which are cited by defendant, the courts held that the State's failure to call a witness did not raise a negative inference because the record did not show that the absent witness was in a better position to observe the occurrence than the other witnesses who did testify. In *People v. Hickman* (1973), 9 Ill. App. 3d 601,

291 N.E.2d 872, the court held that the State's failure to call a witness did not raise a negative inference because the absent witness' testimony would have been merely cumulative.

██ In the case at bar the record does not clearly establish that Jones had a unique knowledge of the event such that the State's failure to call him gave rise to an inference that Jones' testimony would have been unfavorable to the State. It is true, as defendant contends, that testimony from Jones may have resolved some disputed questions of fact. However, Taylor, who testified and was subject to cross-examination, also would have had knowledge of the event as defendant interprets it. Although Jones' testimony would have been helpful to the trier of fact, we conclude the State's failure to call Jones as a witness did not result in substantial prejudice to defendant.

### III.

Defendant next contends that the trial court erred in limiting defense counsel's cross-examination of Taylor. On direct examination Taylor testified that he had been convicted of selling a controlled substance. On cross-examination, defense counsel asked Taylor the following question: "Incidentally, Mr. Witness, you told us that you had been convicted for selling narcotic substances. Have you ever used the stuff?" The court sustained the State's objection to the question.

██ It is well established that the scope and extent of cross-examination rests largely within the discretion of the trial court, and only in a case of clear abuse of discretion resulting in manifest prejudice to the defendant will a reviewing court interfere with the trial court's ruling. (*People v. Ganci* (1978), 57 Ill. App. 3d 234, 240, 372 N.E.2d 1077, *appeal denied* (1978), 71 Ill. 2d 604.) In *Ganci* the victim, who had been shot, testified that he had been convicted of possession of a controlled substance, that he had received methadone treatments for several years and that at the time of the shooting he was undergoing a process of detoxification as part of his treatment. The victim's doctor testified that he prescribed methadone treatment as part of a drug-abuse program as a substitute for hard drugs. The court then sustained the State's objection to questions asked by defense counsel as to what particular drug the victim had been using. The appellate court held that the trial court's ruling was correct because there was no evidence of record that the witness was using or was addicted to narcotics at the times relevant to the case and defense counsel did not make an offer of proof to show the relevance. In *People v. Brown* (1966), 76 Ill. App. 2d 362, 222 N.E.2d 227, *appeal denied* (1967), 35 Ill. 2d 631, the court rejected defendant's contention that he was unduly restricted in his cross-examination of the complaining witness as to whether the witness was a narcotics addict. The court found that there

was no evidence that the witness was an addict, and defense counsel made no offer of proof to support his intended line of questioning. Similarly in the case at bar, we find that the trial court did not abuse its discretion in ruling on the State's objection. There was no evidence in the record that Taylor used narcotics or was using narcotics at the times relevant to this case, and defense counsel did not make an offer of proof to support his question. Although it is true that narcotics addiction has an important bearing upon the credibility of a witness (*People v. Hamby* (1955), 6 Ill. 2d 559, 129 N.E.2d 746), absent an offer of proof by defense counsel the attempted impeachment was improper and the trial court did not err in sustaining the State's objection.

## IV.

Defendant next contends that the trial court erred in admitting the tape recording of the conversation into evidence because the State did not establish a proper foundation for its admission. Defendant argues that the State failed to identify the voices on the tape and to show that Saladino was qualified to operate the recording equipment. The State contends that a proper foundation for admission of the tape was presented by the testimony of investigator Saladino.

■■ ■ Sound recordings, which are otherwise competent, material and relevant, are admissible if a proper foundation has been established to assure the authenticity and reliability of the recording. (*Belfield v. Coop* (1956), 8 Ill. 2d 293, 134 N.E.2d 249.) Saladino testified that he had the electronic recording equipment on his person and recorded a conversation between defendant, Taylor and himself, and that after the conversation he inventoried the tape wheel and tape disk. Saladino identified that tape wheel and cassette disk. After the tape was played, Saladino testified that the tape truly and accurately portrayed the conversation. Saladino's testimony was sufficient to establish that the recording was authentic and reliable. In *People v. Nahas* (1973), 9 Ill. App. 3d 570, 292 N.E.2d 466, defendant argued that admission of a tape recording was error because the voices were never identified. The court rejected the argument and held that there was sufficient identification because the participants to the conversation other than defendant testified that the conversation took place and as to what was said. In the case at bar, all the participants to the conversation, including defendant, testified that the conversation took place. Further, defendant admitted that his voice was on the tape recording and that he said he wanted Saladino to hurt Jones after defendant paid him the money. Thus, we find that there was ample identification of the voices on the tape recording by the testimony of Saladino and by defendant's own admissions. Although defendant argues on appeal that the tape recording was not reliable

because it was in parts unclear, defendant did not include, or request the State to include, the tape recording as part of the record on appeal and we cannot determine, without the benefit of the tape recording itself, that the recording was so unclear as to be unreliable. We note that the mere circumstances of the recording and the necessity for the recording equipment to be concealed would undoubtedly result in some lack of clarity. Further, we find that it was not necessary for admission of the tape recording that the State prove Saladino was qualified to operate the recording equipment. In *People v. Mines* (1971), 132 Ill. App. 2d 628, 631, 270 N.E.2d 265, the court held that for the introduction into evidence of photographs or videotape films, it is not necessary to show the skill or training of the photographer; the only necessary foundation is that the photographs or pictures clearly and accurately portray that which they purport to represent. In the case at bar, Saladino testified that the recording accurately portrayed the conversation and in view of the fact that defendant does not claim that parts of the conversation were erased or deleted, Saladino's testimony assured the reliability of the tape recording. Thus, we conclude that there was a sufficient foundation for admission of the tape recording and the trial court did not err in admitting the recording into evidence.

## V.

Defendant next contends that the trial court erred in denying defendant's motion for acquittal at the close of all the evidence because the court considered and relied upon a duplicate tape recording rather than the original tape which was played during the trial. The State contends that the trial court in a bench trial is presumed to consider only competent evidence and that the record shows that the trial court relied upon only competent evidence.

In support of his motion for acquittal at the close of all the evidence, defense counsel argued that there was nothing in the tape to show that defendant solicited Saladino to commit an aggravated battery upon Jones. The court interrupted and asked defense counsel whether defendant said "I don't want you to do it now. I want you to do it after I get the money." The court then suggested that the tape recording would resolve any question as to what defendant said and the State prepared to play a duplicate tape recording of the original recording played at trial. The duplicate tape recording had been admitted into evidence along with the original recording. Defendant objected to the playing of the duplicate tape recording, and the judge replied that he would allow the duplicate to be played but he would rely on his memory of what was contained on the original tape recording played at trial.

■■ It is well established that in a bench trial the trial court will be

presumed to have considered only competent evidence in arriving at the judgment. (*People v. Pelegri* (1968), 39 Ill. 2d 568, 575, 237 N.E.2d 453.) However, if it affirmatively appears from the record that the court considered incompetent evidence prejudicial to defendant, the judgment will be reversed. (*People v. Smith* (1965), 55 Ill. App. 2d 480, 204 N.E.2d 577.) In *Smith* the record showed that the trial court gave weight to hearsay testimony of complainant and to the testimony of a second complainant after the charge involving the second complainant was dismissed. Similarly in *People v. McGrath* (1967), 80 Ill. App. 2d 229, 224 N.E.2d 660, the record showed that the court asked questions of the witnesses and elicited hearsay testimony and then relied on such testimony in its judgment.

In the case at bar the record does not affirmatively show that the trial court relied upon incompetent evidence or that defendant was prejudiced by the playing of a duplicate tape recording. The trial court specifically stated that it would rely upon its memory of the original tape recording that was properly admitted at trial. Further, defendant does not indicate that there were any discrepancies between the original and duplicate tapes which would have resulted in prejudice to defendant. Thus, defendant has not shown that he was prejudiced by the playing of the duplicate tape recording.

## VI.

Finally, defendant contends that the trial court's questioning of defendant during the State's cross-examination of him resulted in prejudice to defendant and a denial of a fair trial. The court asked defendant several questions regarding defendant's distrust of the police chief and the majority of Evanston police officers, and the court asked defendant whether his voice was on the tape recording played at trial.

■■■ It is clear that a trial court may question witnesses in order to elicit the truth or to bring enlightenment on material issues that seem obscure. (*People v. Palmer* (1963), 27 Ill. 2d 311, 314-15, 189 N.E.2d 265.) The propriety and extent of such examination must be determined by the circumstances of the case and rests largely within the discretion of the trial court. (*People v. Trefonas* (1956), 9 Ill. 2d 92, 100, 136 N.E.2d 817.) Even a rather extensive examination may be justified if the court has reason to believe that a witness is not telling the truth in a nonjury case. (*People v. Dixon* (1967), 81 Ill. App. 2d 330, 225 N.E.2d 445.) Where the case is tried without a jury, the danger of prejudice from questions of the court is lessened. (*Palmer.*) However, the court must not forget its judicial function and assume the role of an advocate.

In the case at bar there is nothing in the record to indicate that the court forgot its function as a judge. The court's questions did not indicate

a bias, prejudice or hostility against defendant but rather were appropriate to the court's role as the finder of fact. The court merely inquired as to defendant's distrust of the Evanston police force in order to arrive at his decision. Also, it may very well be that the court did not believe defendant was telling the truth and therefore was attempting to obtain more specific facts as to why defendant did not trust the police officials. The case cited by defendant, *People v. McGrath*, is distinguishable from the case at bar because in *McGrath* the court became the prosecutor; the record showed that all of the testimony in support of the allegations against defendant was brought out by the court's questioning. In the case at bar the court asked few questions and did not assume the role of the prosecutor. The record does not show an abuse of discretion by the court or prejudice to defendant.

Based on the foregoing we affirm the judgment of the circuit court of Cook County.

Affirmed.

DOWNING and HARTMAN, JJ., concur.