THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
FRED HARVEY, Defendant-Appellant.

First District (5th Division)    No. 79-1180

Opinion filed April 24, 1981.—Rehearing denied May 19, 1981.

Thomas Peters, of Murphy, Putnick, Peters & Davis, Ltd., of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Pamela L. Gray, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Following a bench trial, defendant was found guilty of two counts of solicitation to commit murder (Ill. Rev. Stat. 1975, ch. 38, par. 8—1(a)) and was sentenced to a term of 4 to 15 years. Defendant appeals.

The issues presented are: (1) whether defendant was denied his right to be present at all stages of the trial; (2) whether he was proved guilty beyond a reasonable doubt; (3) whether he effectively withdrew from any criminal plan prior to the occurrence of a substantive offense; (4) whether he was properly sentenced; and (5) whether erroneous admission of the evidence denied him a fair trial.

The following pertinent testimony was adduced at trial.

Fred Drucker, a lawyer with an office at 10 South LaSalle Street in Chicago, testified that while representing the Oak Brook National Bank, he filed suit against another attorney, Jason Mitan, to foreclose on certain properties and several bank accounts which Mitan owned. Mitan was represented by several attorneys, including Gerhard Heckler, whose office was located at 209 North LaSalle Street.

Drucker further testified that on July 8, 1977, he met Michael Filimoniuk in his office, who informed him that his life was in danger. The police were summoned and proceeded to search Filimoniuk, which produced a business card with the name of Gerhard Heckler and the address of 209 North LaSalle Street printed thereon.

Michael Filimoniuk testified that he was convicted of robbery in 1970 and burglary in 1975 and that he was presently in the custody of the Department of Corrections for a parole violation. Filimoniuk testified that early in June 1977, he was arrested on a theft charge. In his attempt to engage the services of an attorney, he had a conversation with Jason Mitan. The following day he went to 209 North LaSalle Street where, after learning that Mitan was not in, he spoke to Heckler about his case and informed him that he did not have enough money to hire a lawyer. After Heckler made a phone call, Filimoniuk was told he would have to talk with defendant. The same day Filimoniuk had a conversation with defendant in Heckler's office, where he informed defendant that he had been sent to him by Jason Mitan concerning the theft charge. Defendant stated that he would have to call Mitan and see what the deal was. After making the phone call, defendant asked Filimoniuk what he did. Filimoniuk responded that he was a burglar. Defendant then asked, "Do you run into cars" to which Filimoniuk responded, "Yes, I do. In fact, I have one right now, a '77 Monte Carlo." Defendant responded, "That's too hot. I can't handle it." When asked if he had any money, Filimoniuk indicated that he could maybe obtain $250 from his father. Defendant said this was not enough and resumed questioning Filimoniuk about other activities. After Filimoniuk indicated that he had done nothing else, defendant stated, "Maybe I got something for you, but we'll see. I have to check you out first." Subsequently Filimoniuk was represented by Heckler on the theft charge, which was dismissed.

The Monday following his court date Filimoniuk met defendant for a

second time alone in his office, where defendant indicated that he had checked him out and that he looked clean. Defendant then stated, "I have something for you if you are interested in some cash." Filimoniuk said, "What?" to which defendant responded, "Have you ever killed somebody?" Filimoniuk answered no. Defendant then asked, "How much would you charge me to kill somebody?" When Filimoniuk answered $20,000, defendant responded that he was crazy. Filimoniuk explained that he was not going to jail for murder or get the electric chair for less than that amount. Defendant told Filimoniuk he could get anybody for $3000 because "the cheapest contract goes for about three or four, five thousand." Filimoniuk and defendant then agreed to $2500, but defendant insisted it be done his way. Defendant told Filimoniuk that he wanted him to go to Fred Drucker's office on Saturday morning, when Drucker would be working on his papers. Filimoniuk was instructed to say, "This is from Jason and Hart" before shooting Drucker in the heart. Defendant also stated that he would provide the gun and that he would try to get a "thirty-eight snubnose with a silencer." Defendant instructed Filimoniuk that it was to be done the following Saturday.

Filimoniuk saw defendant again on Thursday and was instructed that the shooting was to take place "Next Saturday" and that defendant would have the gun for him by next Friday. That weekend Filimoniuk was arrested and charged with grand theft. Filimoniuk called defendant who told him, "Don't worry. I'll try to have someone down there." Filimoniuk was subsequently represented by attorney Heckler and obtained a dismissal of the grand-theft charge.

Filimoniuk testified that in June he had asked defendant for a description of the man he was to kill. Defendant gave Filimoniuk a camera and instructed him to take pictures of the intended victim. After taking some pictures, Filimoniuk returned to defendant's office and described the man he photographed. Defendant responded, "That's him."

Filimoniuk testified that he next saw defendant on Wednesday, still in June. At that meeting defendant informed Filimoniuk that since he kept "getting busted" and causing defendant to provide him with an attorney, defendant was going to take $500 off the deal. Defendant told Filimoniuk that he still wanted him to perform the killing, but that "now we are going to have to kind of slow it down."

Filimoniuk next saw defendant on Thursday during the first week of July when defendant instructed him to make the hit on Saturday. At this meeting defendant gave Filimoniuk a .25-caliber gun to replace a gun Filimoniuk had borrowed from a friend.

The following morning, Friday, July 8, Filimoniuk went to defendant's office and was informed that defendant was not in. He then returned to his car and told his girlfriend, Janice Thompson, that defendant wanted

him to kill this man on the following morning. Ms. Thompson warned him that he better think twice because it may be a trick and that he could get killed. After sending his girlfriend home, Filimoniuk went to the Greyhound bus station where he placed in a locker a suitcase containing the .25-caliber automatic and the camera which defendant had previously given him. Filimoniuk put the locker key in his shoe and proceeded to Drucker's office. Filimoniuk told Drucker that he would exchange some important information for a one-way plane ticket and that his life was in danger. Before giving any details, he secured Drucker's agreement to provide him with a plane ticket. Filimoniuk then told Drucker that he had been hired to kill him. Police arrived and searched Filimoniuk. He was escorted from Drucker's office and taken to police headquarters and then to the State's Attorney's office. Filimoniuk gave the key to the locker to Investigator Wagner, who later retrieved the items contained therein. A charge of disorderly conduct was later dismissed.

On Monday, July 11, Filimoniuk returned to the State's Attorney's office. After speaking with several assistants, Filimoniuk called defendant and said he would like to see him at 2 p.m. The assistants instructed him to talk to defendant about the "hit" and equipped him with a device to record the conversation. He went to defendant's office at 2 p.m. where defendant said that too many people knew about it and that Filimoniuk should lay off the hit. Defendant suggested that maybe he could "bust his [Drucker's] legs."

In a subsequent phone conversation, Filimoniuk asked defendant, "You're gonna give me $200.00 and you want me to forget about the hit too, right?" Defendant responded, "I want you to forget about everything you want to mention. I just want you to forget about it, you understand? Forget about it. Cause that's all I got, that's all I can get. I can't get another nickel."

On Thursday, July 14, 1977, Filimoniuk returned to defendant's office around 5 p.m. accompanied by undercover police officer Zulkowski. Prior to entering, an assistant state's attorney gave him the .25-caliber gun which defendant had previously given him. Filimoniuk carried the gun wrapped in a brown bag. Defendant refused to talk in the presence of Zulkowski, whom Filimoniuk introduced as his bodyguard. Filimoniuk threw the gun down saying, "Here's your gun" and defendant put it away. Defendant then gave Filimoniuk $200 and said, "Phil [Filimoniuk], I don't want to talk about nothing. Get this guy out of here."

Filimoniuk left defendant's office and returned a short time later. Officer Zulkowski waited outside. As he entered, defendant was on the phone saying, "If this guy acts up, take a picture of him as he comes outside." Filimoniuk then questioned defendant whether he was putting a hit out on him. Defendant hung up the phone, put a knife to Filimoniuk's

face and ordered him to the floor. Filimoniuk's call for help was electronically overheard. As the police entered, defendant, still holding the knife, ran to the washroom in the back of his office. The tape which contained the recording from the electronic device attached to Filimoniuk was admitted into evidence without objection. By leave of court, defendant filed a supplemental record containing the court reporter's transcript of the tapes as to the conversation of July 11, 13 and 14, 1977, together with a stipulation of counsel that the transcriptions were true and accurate. The transcripts corroborate substantially Filimoniuk's testimony.

Officers Zulkowski and Srbeny both testified that as they entered they observed defendant holding a knife and standing in the doorway to a washroom in the back of the office. Defendant then went behind the door and closed it. After convincing him that they were police officers, he came out. Officer Srbeny then stepped into the area where he recovered the knife which was laying in an open position on a cot. Zulkowski testified that they did not recover the gun, that he saw defendant put the brown paper bag containing the gun in a desk drawer, and that defendant told Filimoniuk, "I didn't give you no gun."

Defendant was found guilty and sentenced to serve 4 to 15 years in the State penitentiary. At sentencing and at his hearing for an appeal bond, defendant asserted that he was almost 70 years old and suffered from a severe cardiac problem.

OPINION

I

Defendant first contends that he was denied his constitutional and statutory right to be present at all stages of his trial when the court in his absence listened to and considered as evidence three tape recorded conversations between defendant and the State's primary witness. The State maintains that defendant was present during the playing of these tapes and argues that it is unreasonable to conclude from the court reporter's single notation that the tapes were heard in defendant's absence.

"The Illinois Constitution, 1970, Article I, Section 8, as well as the Sixth Amendment to the United States Constitution, guarantee an accused the right to appear and defend in person and by counsel" and "to meet the witnesses face to face." (*People v. Grigsby* (1977), 47 Ill. App. 3d 812, 816, 365 N.E.2d 481, 483; accord, Ill. Rev. Stat. 1975, ch. 38, pars. 115—3(a), 115—4(h) and 115—4.1; *People v. McGrane* (1929), 336 Ill. 404, 168 N.E. 321.) This right extends to every stage of the proceedings from the time of arraignment to final sentencing. (*People v. Lewis* (1979), 73 Ill. App. 3d 361, 386 N.E.2d 910; *People v. Etheridge* (1976), 35 Ill. App. 3d 981, 343 N.E.2d 55.) Unless the defendant waives this right, his presence is

deemed essential. (*People v. Smith* (1955), 6 Ill. 2d 414, 129 N.E.2d 164; *People v. Rife* (1974), 18 Ill. App. 3d 602, 310 N.E.2d 179; 14A Ill. L. & Prac. *Criminal Law* §495, at 495 (1968).) The fact that defendant's counsel was present does not, in itself, excuse defendant's absence (*People v. Lewis; People v. Etheridge*), since defendant's attorney does not have the power to waive defendant's right to be present. (*People v. Mallett* (1964), 30 Ill. 2d 136, 195 N.E.2d 687; *People v. Etheridge.*) However, this right is not absolute; where defendant's substantial rights are not involved or where his presence would be useless, he need not be present. (*People v. Woods* (1963), 27 Ill. 2d 393, 189 N.E.2d 293; *People v. Saltz* (1979), 75 Ill. App. 3d 477, 393 N.E.2d 1292; *People v. Breitweiser* (1976), 38 Ill. App. 3d 1066, 349 N.E.2d 454.) Yet, the right to be present must be protected whenever it has a reasonably substantial relationship to his opportunity to defend himself. (*Snyder v. Massachusetts* (1933), 291 U.S. 97, 78 L. Ed. 2d 674, 54 S. Ct. 330; *People v. Grigsby* (1977), 47 Ill. App. 3d 812, 365 N.E.2d 481.) Nevertheless, to require reversal defendant must demonstrate that he was prejudiced by such absence. *People v. Lewis; People v. Huston* (1977), 46 Ill. App. 3d 170, 360 N.E.2d 986.

The record discloses that after the State completed its direct examination of Filimoniuk an argument arose as to the accuracy of the transcripts prepared by the prosecution prior to trial of the tapes which recorded the conversations between Filimoniuk and defendant. Defense counsel contended the only way he could effectively cross-examine Filimoniuk, or in which the court could determine his credibility, would be to listen to a playback of the tapes. The prosecution conceded that their transcripts might be misleading in that they contained numerous "inaudibles" which the actual tapes would prove audible. The prosecution, however, emphasized that only the tapes were being offered as evidence, and that previously prepared transcripts were merely to be utilized as a guide or convenience. A stipulation was then entered as to the necessary foundation for the tapes to be admissible but no stipulation was made to its contents.

Thereupon, the court discharged the court reporter who made the following notation:

"THE COURT: Mary, you are excused.

THE REPORTER: Thank you, your Honor. (The reporter was excused while court and counsel listened to the tapes in chambers, after which the following proceedings were had in the courtroom.)"

Upon resuming proceedings in the courtroom, the State moved to introduce the tapes into evidence and they were received without objection. Thereafter, defense counsel cross-examined Filimoniuk.

Defendant argues that the court reporter's notation "clearly establishes" that he was not present when the tapes were played by the court to

be considered as evidence. The State admits that this contention is based upon an assumption rather than an express notation and argues that the court reporter's failure to list the specific identities of those persons who went into chambers leaves defendant without actual support for his contention.[1]

■■ While it is generally true that defendant's presence during trial and at the imposition of the sentence must be affirmatively shown by the record (*People v. Smith* (1955), 6 Ill. 2d 414, 129 N.E.2d 164; *People v. Yurkiates* (1949), 404 Ill. 157, 88 N.E.2d 458), where the record shows the presence of defendant when the trial is commenced, it is presumed, absent an affirmative showing to the contrary, that he was present in court during the entire proceedings up to and including final sentencing. *People v. Thigpen* (1966), 33 Ill. 2d 595, 213 N.E.2d 534; *People v. Brindley* (1938), 369 Ill. 486, 17 N.E.2d 218; *Gallagher v. People* (1904), 211 Ill. 158, 71 N.E.2d 842.

In the instant case, there is no question that defendant was actually present in court before and after the playing of the tapes. Accordingly, this court is required to determine whether the court reporter's notation is a sufficient contrary showing to overcome the presumption of defendant's continued presence. Initially, it should be noted that the court reporter made this notation without direction of the court. It appears to represent the court reporter's personal commentary to explain the nature of the proceedings to be had in the reporter's absence. There is no indication that the court reporter was in the judge's chambers to report who was actually present or that this notation was intended as a factual observation or an exhaustive list of those persons who actually entered the judge's chambers.

Defendant has not cited nor has research revealed any decision in which a similar notation was concluded to be determinative of the issue of defendant's presence. The cases relied upon by defendant to support his position are inapposite to the present controversy. In both *People v. Mallett* (1964), 30 Ill. 2d 136, 195 N.E.2d 687, and *People v. Grigsby* (1977), 47 Ill. App. 3d 812, 365 N.E.2d 481, the record affirmatively showed that defendants were not present during a portion of their trial. See also *People v. Smith* (1955), 6 Ill. 2d 414, 129 N.E.2d 164.

Here, the court reporter's notation, while not explicitly indicating that

---

[1] On appeal, this court granted the State's motion to supplement the record pursuant to Supreme Court Rule 329 (Ill. Rev. Stat. 1977, ch. 110A, par. 329). The State's motion included a proposed report of proceedings and unsigned affidavits that defendant was present in chambers during the playing of the tapes. Thereafter, the matter was remanded to the circuit court for settlement and determination; defendant then also submitted a proposed report of proceedings. Neither report of proceedings nor any supporting affidavits have been certified by the circuit court and are, therefore, not properly of record. Ill. Rev. Stat. 1977, ch. 110A, par. 323(c).

defendant also listened to the tapes, certainly does not exclude his presence. Accordingly, this notation fails to affirmatively establish that defendant was not present. As such, this case is comparable to *People v. Mitchell* (1975), 34 Ill. App. 3d 311, 340 N.E.2d 226. There the record showed that defendant was present in open court when the case was called. During the course of that day's proceedings, the court reporter made a notation that the proceedings that followed were heard outside the presence of the jury, apparently in the judge's chambers. When the trial resumed, the trial court stated that the assistant state's attorney had submitted about 12 or 13 instructions and that, "When Mr. Mitchell came in he said he didn't want to look at the stuff; didn't need it—whatever the exact words. I said you may keep it or not as you wish." The appellate court stated that while the record did not specifically place defendant in the judge's chambers, the words "came in" were significant and concluded that it would be unreasonable to assume that the court would proceed in the defendant's absence and that it was more reasonable to infer his presence. 34 Ill. App. 3d 311, 316, 340 N.E.2d 226, 230.

■■ Similarly, while the record in this case does not specifically place defendant present in the judge's chambers, it does not affirmatively establish that defendant was not actually present. (See *People v. Pulley* (1973), 11 Ill. App. 3d 292, 296 N.E.2d 373, *rev'd on other grounds* (1974), 58 Ill. 2d 171, 317 N.E.2d 570; *People v. Callahan* (1974), 16 Ill. App. 3d 1006, 307 N.E.2d 188.) Considering the experience and conscientiousness of the trial judge in the instant case, it would be unreasonable to assume that the court would receive or listen to evidence in defendant's absence. Accordingly, based on the record before us, it is more reasonable to infer defendant's presence during the playing of the tapes. *People v. Mitchell.*

Assuming in *arguendum* that defendant was not present during the playing of the tapes, he has failed to establish prejudice. Prior to the playing of the tapes, defendant's counsel in defendant's presence stipulated to the necessary foundation for the tapes to be admissible. At that time defense counsel had in its possession a copy of the State's previously prepared transcript of these tapes. Defense counsel's only objection to the use of these transcripts was that they contained numerous inaudibles which he claimed would prove audible upon listening to the actual tapes. Except for the inclusion of these "inaudibles," defendant did not challenge the accuracy of these transcripts. At this point the court reporter was excused and "the court and counsel" listened to the tapes in chambers to determine whether the questioned portions of the State's previously prepared transcripts were actually audible. Thereafter, in open court and in defendant's presence, the tapes were offered and received into evidence without objection. Although defendant has the right to be present at every stage of trial, this right is not absolute; where defendant's

substantial rights are not involved or where his presence would be useless, he need not be present. *People v. Saltz* (1979), 75 Ill. App. 3d 477, 393 N.E.2d 1292; *People v. Van Pelt* (1974), 18 Ill. App. 3d 1087, 311 N.E.2d 184.

In *People v. Van Pelt*, the defendant contended that error was committed when he was absent during a conference on instruction and during which a motion to dismiss the proceedings was heard and denied. That court, while noting that a defendant does have a right to be present when his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge, concluded that defendant's presence during a conference on instructions at which time a motion to dismiss was argued, would have in no way enhanced his defense. 18 Ill. App. 3d 1087, 1092, 311 N.E.2d 184, 187-88.

Similarly, in the case at bar, defendant's presence would have contributed nothing to the determination of whether upon playback the questioned portions of the tapes would prove audible. (Compare *People v. Saltz*.) Accordingly, defendant has failed to establish how his absence in any way prejudiced his defense. (*People v. Lewis* (1979), 73 Ill. App. 3d 361, 386 N.E.2d 910; see also *People v. Rettig* (1972), 50 Ill. 2d 317, 278 N.E.2d 781.) Consequently, the failure of defendant to be present during the playing of the tapes would not require reversal.

## II

Defendant next contends that he was not proved guilty beyond a reasonable doubt.

It is for the trier of fact to determine the credibility of witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. (*People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733; *People v. Harris* (1972), 53 Ill. 2d 83, 288 N.E.2d 873.) In a bench trial the credibility of a witness is to be determined by the court whose judgment will not be set aside unless the proof is so unsatisfactory as to create a reasonable doubt of guilt. (*People v. Herron* (1979), 76 Ill. App. 3d 437, 395 N.E.2d 169; *People v. Nichols* (1975), 32 Ill. App. 3d 265, 336 N.E.2d 194.) The fact that a witness is an accomplice or expects leniency does not destroy the competency of his testimony; however, it does affect the weight thereof and the credibility to be accorded the witness. (*People v. Nettles* (1969), 107 Ill. App. 2d 143, 246 N.E.2d 29.) Nevertheless, the uncorroborated testimony of an accomplice is sufficient to support a criminal conviction. *People v. Reese* (1980), 90 Ill. App. 3d 284, 412 N.E.2d 1179; *People v. Kiel* (1979), 75 Ill. App. 3d 1030, 394 N.E.2d 883.

In the instant case, Filimoniuk's uncontradicted testimony established that he first contacted defendant in an attempt to engage the services of an attorney concerning a theft charge. His need for an attorney as well as

his inability to pay for legal services supports his testimony that he was requested to perform "other services." In addition, Filimoniuk's testimony is corroborated by the taped conversations between defendant and Filimoniuk. These tapes unquestionably show that defendant and Filimoniuk had reached a prior agreement that defendant wanted him to forget. Drucker's testimony indicates that defendant had a motive to kill Drucker and Filimoniuk's conversation with Drucker shows that Filimoniuk was aware of this motive. Finally, the court was fully aware of his prior criminal background and undoubtedly considered this fact when weighing his testimony.

We have carefully reviewed the record and find that the inconsistencies alluded to by defendant are not sufficient to create a reasonable doubt as to defendant's guilt.

### III

Defendant also contends that his conviction of solicitation to commit murder must be reversed since he withdrew from any criminal plan prior to the commission of the substantive offense. The State maintains that the crime of solicitation is complete when the request is made with the requisite intent and that it defies common sense that an individual could withdraw from an offense which has already been completed.

■■ A person commits the offense of solicitation when, with the intent that the offense be committed, he commands, encourages or requests another to commit that offense. (Ill. Rev. Stat. 1975, ch. 38, par. 8—1(a); *People v. Latham* (1979), 73 Ill. App. 3d 995, 392 N.E.2d 43.) The offense of solicitation is complete when the principal offense is commanded, encouraged or requested with the intent that it be committed. (*People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840; *People v. McCommon* (1979), 79 Ill. App. 3d 853, 399 N.E.2d 224.) Unlike a conspiracy conviction where the State must prove that a defendant committed an act in furtherance of an agreement to commit an offense, to sustain a conviction for solicitation the State need only prove that a defendant commanded, encouraged or requested another to commit an offense. Compare Ill. Rev. Stat. 1975, ch. 38, par. 8—2, with par. 8—1.

Defendant cites *People v. Rybka* (1959), 16 Ill. 2d 394, 158 N.E.2d 17, and *People v. Brown* (1962), 26 Ill. 2d 308, 186 N.E.2d 321, for the proposition that withdrawal is a defense to a conspiracy charge. He then argues that these holdings are supportive of his position that withdrawal is a defense to solicitation since solicitation may be thought of as an attempt to conspire.

First, defendant begins his argument on a misunderstanding of the principles involved in the cases upon which he relies. In both *Rybka* and *Brown*, each of the defendants was charged with murder, not conspiracy

to commit murder. On appeal, they contended that their convictions for murder had to be reversed because they had successfully withdrawn from the criminal enterprise of their companions prior to the substantive offense. Neither case considered whether an individual could withdraw from a conspiracy after he agreed with another, with the requisite intent, to the commission of an offense and takes an act in furtherance of such agreement.

■■■ Second, the crimes of solicitation and conspiracy are separate and distinct crimes whose elements contain critical differences and are therefore not lesser-included offenses of the other. (*People v. Latham* (1979), 73 Ill. App. 3d 995, 392 N.E.2d 43.) Once the evidence establishes that the essential elements of the offense have occurred, it follows that there can be no withdrawal from a completed offense. (See generally *People v. McCommon* (1979), 79 Ill. App. 3d 853, 399 N.E.2d 224; *People v. Swimley* (1978), 57 Ill. App. 3d 116, 372 N.E.2d 887, *cert. denied* (1978), 439 U.S. 911, 58 L. Ed. 2d 257, 99 S. Ct. 281.) Accordingly, we find defendant's claimed defense of withdrawal without merit.

## IV

■■ Defendant next contends that his sentence must be vacated and remanded because the trial court failed to specify the particular evidence, information, or other factors which led to his sentencing and because it is excessive.

Defendant elected to be sentenced under the code in effect at the time the offense was committed. (Ill. Rev. Stat. 1975, ch. 38, par. 1000—1—1 *et seq.*) Unlike this sentencing statute the trial court was not required to specify on the record the factors leading to the sentencing determination. (*People v. Partee* (1975), 29 Ill. App. 3d 423, 331 N.E.2d 111; *People v. Shelton* (1975), 33 Ill. App. 3d 871, 338 N.E.2d 585.) Between the time defendant committed the offense of solicitation and the time of his sentencing, a new unified code of corrections was in effect which required the trial judge to "specify on the record the particular evidence, information, factors or other reasons that led to his sentencing." (Ill. Rev. Stat. 1978, ch. 38, par. 1005—4—1(c).) Defendant now argues that even though he elected to be sentenced under the 1975 sentencing code, the trial court was still required to specify the factors leading to the court's determination as required by the 1978 sentencing code. The State submits that no error occurred in failing to comply with the 1978 sentencing code where defendant elected to be sentenced under the 1975 code.

The defendant in *People v. Milam* (1980), 80 Ill. App. 3d 245, 399 N.E.2d 703, presented the identical argument. That court held:

"Having elected to be sentenced under the old act, which does

not require a sentencing judge to state for the record his reasons, the defendant cannot now be heard to complain that the sentencing judge did not state for the record his reasons for the sentence imposed." (80 Ill. App. 3d 245, 252-53, 399 N.E.2d 703, 708.)

We find this decision dispositive of the issue, and therefore find defendant's contentions without merit. See also *People v. Green* (1980), 86 Ill. App. 3d 852, 408 N.E.2d 479.

Defendant also argues that a sentence of 4 to 15 years is excessive in light of his age, health and the fact that no one was hurt by the solicitation. The trial judge is normally in a better position than a reviewing court to assess and weigh all the factors relevant to the sentence. (*People v. Day* (1979), 75 Ill. App. 3d 571, 394 N.E.2d 1378; see also *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Absent an abuse of discretion, the sentence imposed by the trial court will not be altered. *People v. Lykins* (1979), 77 Ill. 2d 35, 394 N.E.2d 1182, *cert. denied* (1980), 445 U.S. 952, 63 L. Ed. 2d 787, 100 S. Ct. 1602; *People v. Perruquet.*

■■ The record indicates that the court considered defendant's age and health and took steps to assure that defendant would receive his medication. The trial court was also aware of defendant's prior criminal record. The fact that no one was hurt by defendant's actions is not a mitigating factor to the crime of solicitation which is complete when the principal offense is commanded, encouraged or requested with the intent that it be committed. *People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840.

■■ Finally, the sentence in the instant case was well within the statutory limits. Accordingly, we find no abuse of discretion.

## V

Finally, defendant contends that the cumulative effect of several errors with regard to the admissibility of evidence denied him a fair trial.

First, defendant argues that a letter sent by Mitan and received by Drucker should not have been admitted into evidence since the letter and its contents were hearsay. A review of the record indicates that this letter was never admitted into evidence. The State merely used this letter, marked only for identification purposes, to refresh Drucker's recollection. Accordingly, we find this contention without merit.

Second, defendant argues that the court erroneously admitted hearsay evidence when it allowed the State to introduce transcripts of phone calls between defendant and Filimoniuk. He submits that Filimoniuk was present to testify about the transcripts and the prosecutor failed to bring in the court reporter to verify the accuracy of the transcripts.

■■ Sound recordings on tape which are otherwise competent, material and relevant are admissible if a proper foundation has been laid to assure the authenticity and reliability of the recordings. (*Belfield v. Coop* (1956),

8 Ill. 2d 293, 134 N.E.2d 249; *Roedl v. Lane* (1976), 41 Ill. App. 3d 1062, 355 N.E.2d 354.) The recording is said to have an identity of its own, separate and apart from the voices recorded (see *Belfield*), so that it is not treated as hearsay but as a mechanical eavesdropper so that it is not barred as communication that would otherwise be privileged or confidential. (Hunter, Trial Handbook for Illinois Lawyers §50:7 (4th ed. 1972); Annot., 58 A.L.R.2d 1024 (1958).) The record also reveals that defendant stipulated to the necessary foundation for the transcripts to be admissible into evidence. He specifically stipulated that "the typed transcript was a true and accurate, authentic and correct transcript." Accordingly, the trial court properly admitted the tapes into evidence.

■■ Third, defendant maintains that the court erred in denying his objection, during Filimoniuk's testimony, to the introduction of a conversation concerning "hot cars." Relying on *People v. Cage* (1966), 34 Ill. 2d 530, 216 N.E.2d 805, and *People v. Lehman* (1955), 5 Ill. 2d 337, 125 N.E.2d 506, he argues that the conversation was irrelevant and highly prejudicial. These cases stand for the proposition that evidence of the commission of other crimes by the accused, in addition to that for which he is on trial, is inadmissible unless it has independent relevance beyond the inference that because a man has committed other crimes he is more likely to have committed the current crime. As such, these decisions are inapposite to the present controversy. The discussion in the instant case only implicated Filimoniuk in prior criminal activity. It in no way constituted evidence that defendant had been involved in the commission of prior crimes. Furthermore, this conversation was relevant in that it tended to show the total circumstances surrounding the alleged solicitation. The reference to hot cars was an integral part of defendant's inquiry prior to soliciting Filimoniuk to commit a murder. Accordingly, we find that the conversation was both relevant and admissible.

For the reasons stated, the judgment of the trial court is affirmed.

Affirmed.

LORENZ and WILSON, JJ., concur.