THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES EDENS, Defendant-Appellant.

First District (2nd Division)   No. 85—3735

Opinion filed August 16, 1988.—Rehearing denied October 18, 1988.

Paul Bradley, of Chicago, for appellant.

Richard J. Daley, State's Attorney, of Chicago (Inge Fryklund, James E. Fitzgerald, and Judith M. Pietrucha, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

James Edens, Ramon (Ricco) Montague, and Deborah Weathersby were charged with murder, home invasion and attempt (murder) (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1, 12—11, 8—4) in connection with an incident which occurred on March 21, 1984, at the residence of Harry Schennault in the City of Chicago. Edens was granted a severance from his codefendants, convicted of all counts by a jury, and sentenced to 65 years for murder, with concurrent sentences of 30 years for attempt (murder) and home invasion.

This appeal concerns only defendant James Edens, who raises the following issues: (1) whether he was proved guilty beyond a reasonable doubt; (2) whether the trial court erred in refusing to allow him to call Deborah Weathersby as a witness; (3) whether the trial court erred in refusing to allow him to publish to the jury prior statements of Weathersby, the State's chief witness; and (4) whether the trial court erred in imposing an extended-term sentence on the murder conviction and the maximum sentence on the other counts.

The State's first witness was Ray Simpson, who testified that his mother, Phyllis Alvarez, the sister of Yvonne Schennault, was employed as a housemaid for the Schennaults. He last spoke with his mother on March 19, 1984, about her moving out of the Schennault house "[b]ecause of the dope and dealing and all the other law-breakers going by." On March 21, while at work, he received a call notifying him that his mother had been shot.

The State's second witness, Joseph Airhart, testified that he was a Chicago police officer, and that on March 21, 1984, he was working alone in a marked squad car when he received a call regarding a home invasion in progress. He proceeded to 80th and Yates and observed an elderly gentleman dressed only in his underwear, whom he later learned was Harry Schennault, running down the street. Schennault, bleeding from his right cheek and his left leg, told Airhart that he had been shot. The officer proceeded to the Schennault residence, where he saw a woman who appeared to be dead lying on the floor bleeding.

Lilly Lovett testified that she worked as a clerk for Harry Schennault and that she knew Phyllis Alvarez, Harry's sister-in-law. On March 21, 1984, at about 2:30 in the afternoon, Lovett went to Harry's house, where she found Mrs. Alvarez downstairs and Harry

upstairs in the bedroom going over some paperwork while on the telephone. Lovett went up to Harry's bedroom and sat in a chair against the wall while she was going through some papers. At about 3:30 Deborah Weathersby rang the bell, and Mrs. Alvarez called up to Harry, who told her to let Deborah in. Lovett looked down from upstairs and recognized Weathersby. The next thing she heard was Mrs. Alvarez scream, "oh, no" and two shots. After Lovett told Harry that it was a robbery, she heard him tell his friend on the telephone to call the police. Lovett ran through a bathroom and into the hallway, where she encountered a man with a gun. She begged him not to shoot, and he chased her upstairs to Phyllis' bedroom, where she unsuccessfully tried to lock the door. She then broke the window and jumped out, during which time she heard more shots. She stayed on the roof until the police came with a ladder.

A few days later Lovett was taken to the police station to view a lineup, where she identified Ricco Montague as the man she saw with the gun, both in the hallway with Alvarez and upstairs chasing her into the bedroom. She had never seen Montague before that date. On cross-examination, Lovett stated that she saw only two people in the house, Weathersby and Montague; she did not see James Edens in the Schennault house.

Deborah Weathersby, who was charged as a codefendant, testified for the prosecution. She stated that Ricco Montague was her boyfriend in March of 1984 and that she was a very good friend of Mr. Schennault, whom she had worked for in the past. Several weeks prior to March 21, 1984, Deborah had conversations with Montague about getting into Schennault's house in order to rob him of the drugs and money she knew were there. Weathersby testified that on March 21, 1984, she met Montague at a store at 81st Street and Cottage Grove Avenue; Montague had arrived there in a car driven by Edens. She had called Schennault's house and told him she was coming over. The plan, which the three discussed on the way to the house, was that she and Ricco would go in first, and Edens would come in later. She testified that she saw three weapons in the car; Edens and Montague each had a gun, and there was a rifle in a briefcase. When they arrived at the Schennault home Alvarez let Weathersby and Montague in; Edens was still in the car. Montague grabbed Alvarez; they struggled and he shot her.

According to Weathersby, Edens came into the house, and he and Montague went upstairs toward Schennault's bedroom. She heard shots, Lovett's pleas, a lot of running, and more gunshots. She then heard Edens say that Schennault had called the police and that they

had to leave. They ran out to Edens' car and went to pick up Edens' wife at her place of employment.

The four of them returned to Edens' house, where they ate dinner and watched the news, during which time Weathersby left to make a phone call. She got money together and went to Detroit for a few days, but she later returned to Chicago and turned herself in to the police. She accompanied the police to the defendant's apartment and identified the car and defendant when he drove up.

On cross-examination, Weathersby admitted that she had been buying and selling drugs for five years, ever since she was 18 years old, and had worked as a prostitute for Schennault. She admitted that she was told that if she testified at Edens' trial the State would recommend a sentence of six years. She also testified that the first time she spoke with the police she told them that Edens, whom she knew as Bob, had gone into the house first, and that she lied because she was afraid of Montague. Eventually she gave the assistant State's Attorney a written statement which she said was the truth as was her testimony at the trial.

Edens was arrested when Weathersby led the police to his apartment. During questioning he told Detective McGuire that on March 21, 1984, he received a call from Montague, who asked Edens to pick him up at 22nd Street and the Dan Ryan Expressway. When he did so, Weathersby was with Montague, and the three of them drove to Oak Brook to pick up Edens' wife at work at 4:30. They all returned to Edens' apartment, where they watched television. McGuire further testified that Edens told him that there was "something about the murders on the TV," and Edens figured that Deborah and Ricco might have done it. They made several phone calls, and at about 9 o'clock, when Edens' brother Marcus came over, they drove Ricco and Deborah back to the city.

Assistant State's Attorney Joseph J. McNerney testified that he went to the police station after being notified that two suspects were in custody regarding a homicide, home invasion, robbery and investigation on the south side. He reviewed police reports and listened to a tape recording of the interview with Deborah Weathersby before he interviewed her; he then took a court-reported statement of her version of the facts.

McNerney then interviewed Edens. He advised Edens of his rights, and Edens asked what the evidence was against him. When McNerney told him he was implicated as one of the three offenders in this case, Edens responded that all he did was to pick up Montague and Weathersby after the robbery and that he had not shot anyone.

McNerney told Edens that he had been implicated in the robbery by Weathersby. Edens then indicated to McNerney that he had participated in the robbery, but that he did not have a gun, and that Ricco and not he had done the shooting. Edens said he was just doing it for drugs and money. At that point, according to McNerney, Edens told him he wanted to wait until his brother came in order to tell the whole story. McNerney told Edens he could not wait to talk to his brother and left to write up defendant's statement with which he returned 40 minutes to an hour later. When he read the statement to him, Edens denied telling McNerney anything about the facts of the case and refused to sign the statement. McNerney stated that Edens refused to sign the statement because he realized that he was going to be charged with murder.

After the State rested, defense counsel requested leave to call Deborah Weathersby as his own witness. The court denied the request, ruling that the defendant had had ample opportunity to cross-examine her when she testified. When defense counsel requested permission to play Weathersby's tape-recorded statement for the court in order to show that it was impeaching, the court denied the request, stating that defense counsel had the tape in his possession when Weathersby was on the stand and had failed to use it for impeachment at that time.

Edens' testimony in court was substantially the same as the answers he had given to Detective McGuire during his initial interrogation: that he picked up Montague and Weathersby late in the afternoon and that he had never been at the Schennault house and was not there with Ricco and Deb at the time of the robbery and murder. Edens testified that he had never seen People's exhibit No. 26, which was a handwritten statement prepared by Assistant State's Attorney McNerney. He further claimed that a statement of his in typewritten form and a one-page typed statement by Weathersby were not presented in court and that he was not read his *Miranda* rights by the detectives.

Following the defendant's testimony, the court, on objection by the State, refused to allow the reading of Weathersby's court-reported statement, ruling that it was a prior consistent statement. The court also ruled that the tape of Weathersby's statement to the police was not admissible.

The jury found Edens guilty of all charges. At the sentencing hearing, the State argued for an extended term while the defendant argued for the minimum term of 20 years. The court found that the offense was accompanied by "exceptionally brutal and heinous behavior indicative of wanton cruelty" and that the defendant was a willing

participation, thereby making him eligible for an extended-term sentence. The court also considered the defendant's premeditation and deliberation and the total absence of remorse on the defendant's part. He was sentenced to 65 years for murder and concurrent sentences of 30 years each for home invasion and attempt (murder).

## I

■ The defendant first argues that he was not proved guilty beyond a reasonable doubt because the only testimony linking him to the crimes came from Deborah Weathersby, who claimed he was an accomplice, and an oral admission testified to by Assistant State's Attorney McNerney which defendant claims he never made.

Defendant argues that Weathersby must be disbelieved because she is a drug user and seller and an accomplice testifying in return for a substantial reduction in charge and sentence. In addition, he contends that the testimony of an impartial eyewitness, Lilly Lovett, did not substantiate the testimony of Weathersby.

As to his first point, defendant cites *People v. Strother* (1972), 53 Ill. 2d 95, 290 N.E.2d 201, for the proposition that "the testimony of a narcotics addict is subject to suspicion due to the fact that habitual users of narcotics become notorious liars." (53 Ill. 2d at 99.) As the State points out, however, there is no evidence that Weathersby was a drug addict, but merely testimony that she had used drugs.

As to defendant's second contention that Weathersby was an accomplice who testified in exchange for a reduced sentence, there is no question based on the record but that she was one of the two primary participants in the planning and carrying out of the home invasion, that her boyfriend Ricco Montague murdered Phyllis Alvarez, and that she received a sentence of six years in return for her testimony against Montague and Edens.

The Illinois Supreme Court discussed uncorroborated accomplice testimony in *People v. Wilson* (1977), 66 Ill. 2d 346, 362 N.E.2d 291, as follows:

> "[T]he rule that uncorroborated accomplice testimony is a sufficient ground on which the trier may base a conviction has found almost overwhelming favor in Illinois. [Citations.] This court has never questioned the wisdom of regarding such testimony with skepticism and suspicion, however. It is fraught with serious weaknesses such as the promise of leniency or immunity and malice toward the accused. [Citation.] Such testimony should be subject to careful scrutiny, 'acted upon with great caution' [citation], and have the 'absolute conviction of the

truth' [citation]. It is also true that whether accomplice testimony, corroborated or uncorroborated, is a satisfactory basis for conviction goes to the weight of the evidence and is, therefore, in the province of the jury or the court." 66 Ill. 2d at 349.

Moreover, as this court stated in *People v. Harvey* (1981), 95 Ill. App. 3d 992, 420 N.E.2d 645:

"It is for the trier of fact to determine the credibility of witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. [Citations.] *** The fact that a witness is an accomplice or expects leniency does not destroy the competency of his testimony; however, it does affect the weight thereof and the credibility to be accorded the witness." 95 Ill. App. 3d at 1001.

The jury heard the testimony of Weathersby in which she stated that Edens drove her and Montague to the Schennault house on March 21, 1984. She testified that they discussed the robbery before arriving and that both Ricco and Edens, who came into the house later, carried guns. Weathersby described the defendant, his car, and led the police to his apartment. The jury also heard defendant state that he picked up Weathersby and Montague after the robbery, thus accounting for her ability to identify him, his car, and the location of his apartment.

The defendant further contends that the proof that Weathersby falsely testified that Edens was at the scene of the robbery is found in testimony of Lilly Lovett, who told of seeing a man with a gun, whom she identified as Ricco Montague, struggle with Phyllis Alvarez. She heard two shots and warned Harry Schennault. At the point at which Weathersby said that the two men, Montague and Edens, went up the stairs to the hallway Lovett saw only Montague; she never saw Edens in the house. Defendant would have the court conclude that this means that Edens was not present. We concur with the State's reasoning, however, that since Lovett was running away after she heard the initial shots, it is more than likely that the jury concluded that she would not have seen him.

The jury heard the evidence relating to Weathersby: her past selling of drugs, her relationship with Schennault and Ricco, her plea bargain with the State, her status as an accomplice, and her admission that she lied to the police when she first talked to them; yet the jury believed her testimony. As the supreme court has said:

"It is peculiarly the province of the jury to weigh the evidence, judge the credibility of witnesses and determine the facts. A reviewing court will not set aside a jury's verdict of

guilty unless the evidence is so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to cause a reasonable doubt as to the guilt of the accused." *People v. Sumner* (1969), 43 Ill. 2d 228, 232, 252 N.E.2d 534.

The jury was also aware of the testimony of Assistant State's Attorney McNerney, who stated that the defendant admitted his participation in the robbery but not the murder. McNerney testified also that Edens made an oral statement but later refused to sign it in written form after he realized that he was going to be charged with murder. Defendant maintains, however, that he told McNerney the same thing he told Detective McGuire and the same thing he testified to in court, which was that he picked up Montague and Weathersby after the robbery.

As we have previously noted, the jury heard the testimony and made their decision based on their determination of the facts. The evidence presented is not "so palpably contradictory to the verdict or so unreasonable, improbable or unsatisfactory" as to cause the reviewing court to set aside the jury's verdict. 43 Ill. 2d at 232.

## II

■ After the State had rested, defense counsel stated his intention to call Deborah Weathersby as a witness for the defendant. The State objected, and the court denied defendant's request. The court's reasoning is reflected in the following exchange:

"THE COURT: Hearing nothing, Mr. Malek, be advised in any way that would warrant the recall of a witness that was subjected to extensive cross-examination relative to all statements she made, relative to her recollection of what transpired on the date and time in question, hearing nothing to support your position requesting that she be recalled, I am going to deny.

MR. MALEK [defense counsel]: Judge, how can you say—

THE COURT: I am going to deny you the right to recall her in your case.

MR. MALEK: Judge, how can you say, you being the Judge, that she has said everything in her statements? You don't know that.

THE COURT: I said you had all that information available to you.

MR. MALEK: The fact I have, it doesn't necessarily mean I have to use it in cross. I can use it in cross, in my case-in-chief, any way I see fit.

> THE COURT: Without giving me a reason as to why you want to recall her, Counsel?
>
> * * *
>
> THE COURT: She is a witness on the stand. She was subjected to your cross-examination.
>
> MR. MALEK: To answer your question, I am going to lay a foundation for her impeachment.
>
> MR. STEED [assistant State's Attorney]: That is totally improper.
>
> THE COURT: Your request to call her as a witness is denied."

Defendant cites Supreme Court Rule 238 (107 Ill. 2d R. 238) for the proposition that either party is permitted to call a witness and impeach her with prior inconsistent statements. That rule states:

> "(a) The credibility of a witness may be attacked by any party, including the party calling him.
>
> (b) If the court determines that a witness is hostile or unwilling, he may be examined by the party calling him as if under cross-examination." (107 Ill. 2d R. 238.)

We fail to perceive that the defendant was denied his right to call and lay the foundation for the impeachment of and later, if necessary, to impeach Weathersby since he was given ample opportunity to do so during her cross-examination. See *People v. Agee* (1980), 85 Ill. App. 3d 74, 405 N.E.2d 1245.

Defendant cites no authority to support his contention that at a critical point such as the one at issue a trial judge may bar the calling of a witness only if it is determined that her testimony is incompetent or has no relevancy to the issues on trial.

The trial judge in the case *sub judice* pointed out that Weathersby's cross-examination had taken two hours, and that defense counsel had all the necessary information in his possession at that time had he wanted to use it to impeach her. In her testimony, Weathersby admitted that she initially told the police a different story than the one she gave from the witness stand. During Weathersby's direct examination defendant objected to any discussion of her previous statement on the ground that "there has been no impeachment [*sic*]," and the court sustained the objection. Moreover, inconsistencies in Weathersby's statements to the police as to who entered the house first and who carried in the sawed-off 30-30 were explored during cross-examination. Here, the trial court refused to allow the defense to recall the witness. As this court stated in *People v. Agee* (1980), 85 Ill. App. 3d 74, 405 N.E.2d 1245:

"However, in *People v. Sanders* [citation], the court refused to permit the defense to recall a witness after completion of cross-examination. In noting that the defense was in no way prejudiced by this refusal, the court stated that without a 'clear abuse, a reviewing court should not disturb the trial court's exercise of discretion with respect to the recalling of a witness.' [Citation.] Therefore it appears that although the trial court has the authority to recall a witness under the circumstances presented here, it is under no duty to do so, and absent a clear abuse of discretion, the trial court's ruling should not be disturbed.

Defendant in the case at bar failed to fully pursue the cross-examination of the victim. In this case the information was available to the defendant, and the prosecution was in no way responsible for the failure of defendant to elicit the desired testimony, and it cannot be said that the trial court abused its discretion in refusing defendant's request." 85 Ill. App. 3d at 82.

The situation in *Agee* parallels that in the case at bar. It was brought out during her direct testimony that Weathersby had given authorities more than one version of the incident. Defendant attacked her credibility on cross-examination, and on redirect Weathersby explained that she did not tell the police the truth the first time because she was afraid of Montague. Consequently, the jury was made fully aware of her inconsistent statements, and it chose to believe her explanation. The trial judge determined that further testimony on the subject from Weathersby would serve no useful purpose. We do not find such determination to be an abuse of his discretion.

III

■ Defendant further argues that the trial court erred in refusing to allow him to publish to the jury Weathersby's prior tape-recorded statement; accordingly, the same discussion we have had as to the issue in part II of this opinion pertains here as well. After the court had ruled that he could not recall her as a witness, defense counsel stated that he wished to play the tape as an offer of proof which would go to the impeachment of Weathersby, and when he explained to the judge the contents of the tape that he felt would be impeaching, the judge replied, "My question to you, Mr. Malek, did you have those tapes in your possession when Deborah Weathersby was on the stand?" Upon receiving an affirmative answer from counsel, the court denied the request, reasoning that counsel had not laid a foundation for his proposed impeachment at the appropriate time.

In *People v. Rios* this court said,

> "A court may abuse its discretion when it refuses to allow defendant to recall a witness to perfect a foundation. This is so because the concept of justice demands that the defendant be given every opportunity to present testimony to the jury that may cast doubt upon the veracity of a State's witness." (*People v. Rios* (1986), 145 Ill. App. 3d 571, 581, 495 N.E.2d 1103.)

However, the situation in *Rios* was different than the one we confront in the instant case, in that in *Rios* the "State was aware of the existence and content of the tape several months prior to the defendant's trial, but the prosecutors never revealed this information to the defendant," although he had made a specific request for it. (*People v. Rios,* 145 Ill. App. 3d at 577-78.) Moreover, defendant's counsel "did not have an opportunity to listen to the tape until the third day of trial after he had already questioned" two critical witnesses. The judge in the instant case did not abuse his discretion when he denied defendant's motion to play the tape since defendant had previously had ample opportunity to use it to impeach Weathersby.

## IV

Defendant's final contention is that the trial court erred in imposing an extended-term sentence as to his murder conviction and the maximum sentence on the other counts, which he argues were all excessive. The presentence investigation report showed that prior to his arrest for the offense forming the subject matter of this case defendant had never been arrested. He was 24 years old at the time of the commission of this offense, had served in the Air Force, had received an honorable discharge, had completed two years of college, was married and had a good employment record. In addition to the fact that this was Edens' first offense, he argues that he was the least culpable of the three defendants in that he was not in the house when Alvarez was killed and he did not fire the shots.

The State cites *People v. Rosenberger* (1984), 125 Ill. App. 3d 749, 466 N.E.2d 608, for the proposition that the lack of a prior record will not necessarily be considered persuasive by the trial court in sentencing. The *Rosenberger* court considered an extended sentence of 80 years appropriate under the circumstances of the case even though defendant had no prior record. Moreover, this court has subsequently stated:

> "Although defendant had no prior criminal record and presented evidence of his good character at the sentencing hearing, the most important factor to be considered in imposing

sentence is the seriousness of the defendant's crime. [Citation.] Moreover, we note that at his sentencing hearing, defendant expressed no remorse for his actions. The court could have taken this into account in imposing an extended-term sentence." *People v. Johnson* (1987), 159 Ill. App. 3d 991, 1001, 513 N.E.2d 852.

Defendant further argues that the extended term imposed for the murder conviction must be vacated because, first, the court erred in finding that "this offense was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty," and second, except in unusual circumstances a person convicted of murder under a theory of accountability cannot be subjected to an extended term.

■ As to defendant's first contention, he cites *People v. Kane* (1986), 140 Ill. App. 3d 928, 489 N.E.2d 500, in which the defendant admitted that he and his codefendant took a gun, entered a cab, announced a holdup, shot the driver in the neck, took his money and fled. The court determined that the defendant did the shooting, and the record indicated that he had at least two prior juvenile burglary adjudications. The trial judge sentenced defendant to 80 years for murder and 60 years for armed robbery; his codefendant, found not to have done the shooting, received a sentence of 20 years. In reducing defendant's sentence, this court found that the crime was not "exceptionally" brutal or heinous. However, we also considered the fact that the defendant was only 17 years old at the time the crime was committed and that he had expressed remorse at his sentencing hearing. In the instant case, Edens was 24 years old at the time of the commission of the crime, the court found that the "offense was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty," and, equally important, the judge determined that the defendant showed "a total absence of remorse."

In the second case cited by defendant, this court vacated an extended-term sentence of a defendant who, while robbing a dice game, shot and killed one person and shot and wounded three other persons. This court stated, "We have construed this statute [(Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(2))] as not permitting imposition of an extended term except when the degree of brutality of heinousness is exceptional." *People v. Holiday* (1985), 130 Ill. App. 3d 753, 757, 474 N.E.2d 1280.

Defendant's argument fails to swerve us from the basic principle that it is within the court's discretion to determine what constitutes "exceptionally brutal and heinous behavior indicative of wanton cruelty" for the purpose of imposing an extended sentence. Our supreme

court has stated that the phrase "exceptionally brutal or heinous behavior indicative of wanton cruelty" does not require torture or unnecessary pain, and, citing Webster's Third World Dictionary, stated that the word "heinous" has been defined as "hatefully or shockingly evil" or "grossly bad"; and that the term "brutal" includes any conduct which is "devoid of mercy or compassion," or "cruel or cold-blooded." (*People v. La Pointe* (1981), 88 Ill. 2d 482, 501, 431 N.E.2d 344.) The *La Pointe* court pointed to the premeditated, cold-blooded deliberation involved in the crime and the defendant's complete lack of remorse as reasons for upholding an extended-term sentence.

■ As to defendant's conviction in the instant case under the theory of accountability, the State points to *People v. Clay* as authority for the principle that the application of the extended-term statute is determined by the offense, not by the extent or nature of the offender's participation therein, and the fact that a defendant is convicted under the theory of accountability or that his participation in the crime was less than that of his co-offenders does not preclude the imposition of an extended sentence upon him. (*People v. Clay* (1984), 124 Ill. App. 3d 140, 154, 463 N.E.2d 929.) In *Clay* the defendant supplied all the necessary background information for a robbery of his neighbors. He remained in his apartment during the crime only because he knew he would be recognized by the victims. In the course of the robbery, a 10-year-old girl was killed with a shotgun. This court upheld an extended-term sentence for defendant although it reduced it from 80 to 60 years.

This court further stated in *People v. Johnson* (1985), 132 Ill. App. 3d 1, 476 N.E.2d 1321:

> "[T]his court upheld the imposition of extended-term sentences where the defendant's conviction was based on an accountability theory and where the court found there was brutal and heinous conduct on behalf of the defendant indicating wanton cruelty." (132 Ill. App. 3d at 7.)

In *Johnson*, a defendant who participated in the robbery and rape of a woman but did not actually kill her was found guilty of all charges and given an extended-term sentence. The trial judge found that the offenses were accompanied by " 'exceptional brutality or heinous behavior indicative of wanton cruelty such as to authorize extended term.' " (132 Ill. App. 3d at 8.) This court found no error in the sentence.

In *People v. Jordan* (1984), 103 Ill. 2d 192, 469 N.E.2d 569, several causes were consolidated on appeal since each case asked the court to interpret the Illinois statute on sentencing for an extended

term. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2(a).) Defendant Rowe contended that the extended-term sentence for his murder conviction was not valid because his conviction was based on an accountability theory. The evidence at Rowe's trial showed that he took part in the robbery of a grocery store and that his participation in the crime was limited to restraining an employee of the store. However, his accomplice was armed and fatally shot the store owner. At the sentencing hearing, the trial judge found that there was "brutal and heinous conduct on behalf of the defendant indicating wanton cruelty." 103 Ill. 2d at 202-03.

The *Jordan* court compared this issue of accountability to the enhanced penalty of consecutive sentences and reasoned:

"The court then noted that the legislature was presumed to know that the accountability statute had been so interpreted and '[h]ad the General Assembly intended that the consecutive sentencing provisions be inapplicable to a defendant found guilty under [that statute] it would have been a simple matter to provide for an exception as it did in section 9—1(b)(6)(a) of the Criminal Code of 1961.' [Citation.] We note that section 9—1(b)(6)(a) (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6)(a)) provides specifically that the victim be actually killed by the defendant and not by any other party to the crime.

However, the legislature did not provide in section 5—5—3.2(b)(2) that the defendant himself commit the brutal or heinous act. We therefore conclude that the enhanced penalty of an extended-term sentence may be imposed upon a defendant found guilty upon an accountability theory." 103 Ill. 2d at 214-15.

This court recently applied the principle of *Jordan* in *People v. Lekas* (1987), 155 Ill. App. 3d 391, 508 N.E.2d 221, a case in which two brothers were accused of armed robbery, murdering the victim, a woman of over 60 years, in the home of her son-in-law and then setting fire to the house. Phillip's confession, introduced at trial, placed him at the scene of the crime and implicated his brother as the actual killer. As we stated:

"Phillip further argues that the extended-term sentence was an abuse of discretion because he was 19 at the time of his arrest, had no prior convictions, and the State's evidence showed that he did not shoot Mrs. Samp. However, our supreme court has authorized imposition of extended-term sentences for defendants found guilty under an accountability theory. [Citation.] Christopher, the actual trigger man, was given a proportion-

ately greater 70-year sentence." (155 Ill. App. 3d at 416.)

We note in the instant case, the "trigger" man, Ricco Montague, was also given a proportionately higher sentence, natural life imprisonment.

Moreover, "the standard of review of a sentence claimed to be excessive is whether in fact the trial court exercised its discretion and, if so, whether this discretion was abused." (*People v. Cox* (1980), 82 Ill. 2d 268, 275, 412 N.E.2d 541.) As the supreme court further stated in another case:

> "This court, *** has the power to reduce a sentence imposed by the trial court. However, this court has held that the matter of imposing sentence is a matter of judicial discretion and the standard to be applied in determining whether a sentence is excessive is: Did the trial judge abuse his discretion? [Citation.] In *La Pointe*, this court also emphasized that the trial court is normally the proper forum in which a suitable sentence is to be determined and that the trial judge's decisions in regard to sentencing are entitled to great deference and weight. [Citation.] It is not the function of this court to serve as a sentencing court, and we will not substitute our judgment for that of the trial court 'merely because we would have balanced the appropriate factors differently if the task of sentencing would have been ours.'" *People v. James* (1987), 118 Ill. 2d 214, 228, 514 N.E.2d 998, quoting *People v. Cox* (1980), 82 Ill. 2d 268, 280.

As previously noted, the trial judge made a specific finding that the offense in the instant case was accompanied by "exceptionally brutal and heinous behavior indicative of wanton cruelty," and he further found "a total absence of remorse" on the part of the defendant. When we review the facts of this case in which the armed defendants fiendishly planned this robbery, savagely invaded a home in the middle of the afternoon, brutally shot Phyllis Alvarez, a victim who in no way antagonized the perpetrators of the crime or provoked the shooting, inhumanly terrorized Lilly Lovett, and mercilessly shot Harry Schennault, we cannot say that the judge abused his discretion in imposing an extended-term sentence upon defendant.

Accordingly, for the reasons expressed, we affirm the circuit court of Cook County.

Affirmed.

BILANDIC and EGAN, JJ., concur.