THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAMON MONTAGUE, Defendant-Appellant.

First District (2nd Division) No. 1—86—2082

Opinion filed April 25, 1989.

Paul P. Biebel, Jr., Public Defender, of Chicago (Crystal H. Marchigiani and Kyle Wesendorf, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Judy L. Groeneveld, and Andrea Muchin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Ramon Montague, James Edens, and Deborah Weathersby were charged with murder, home invasion and attempt (murder) (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1, 12—11, 8—4), all committed on March 21, 1984, at the residence of Harry Schenault in the City of Chicago. Montague was tried separately, convicted of all counts by a jury, and, after the jury declined to impose the death penalty sought by the State, he was sentenced to natural life imprisonment on the murder charge, 30 years to be served concurrently for attempt (murder), and 30 years, also concurrent, for home invasion.

This appeal concerns only Montague,[1] who assigns the following

---

[1]The appeal of Montague's codefendant, James Edens, is reported at *People v. Edens* (1988), 174 Ill. App. 3d 1033, 529 N.E.2d 617.

errors on appeal: (1) that the trial court improperly refused to permit defendant to introduce hearsay testimony regarding another murder; (2) that it wrongfully prevented the defense from impeaching key State witnesses against defendant; (3) that it prejudiced defendant by admitting evidence that defendant was in Federal custody when he was interrogated about this case; (4) that it permitted prosecutorial misconduct during closing argument, warranting a reversal of the convictions; (5) that it allowed the jury to view autopsy photos of the victim when the cause of death was not an issue in the case; (6) that its imposition of a sentence of natural life imprisonment must be vacated because the trial court based the sentence on the erroneous finding that the offense was brutal and heinous; and (7) that the delay of two years before the defendant was brought to trial violated defendant's right to a speedy trial.

Prior to trial, the judge granted the People's motion *in limine* to preclude defendant from mentioning anything relative to a 1983 homicide in his opening statement, and further specified that if the issue arose during cross-examination of any of the State's witnesses, it would be taken up again in a side-bar conference.

On March 21, 1984, at about 3:15 p.m., Chicago police officer Airhart received a call that a home invasion was in progress at 2354 E. 80th Street. Airhart, the first officer on the scene, found Harry Schenault running northbound on the west side of Yates Avenue. Schenault told Airhart that a black man shot him, and Airhart observed injuries to Schenault's cheek and thigh. Airhart immediately called for an ambulance and proceeded to Schenault's home. There, Airhart saw a woman, later identified as Phyllis Alvarez, who appeared to be dead, lying on the staircase, and bleeding from gunshot wounds to the head.

Chicago Detective Flood was also summoned to the Schenault residence and arrived there at approximately 4:00 p.m. He noted Phyllis Alvarez' body on the staircase as he went up to Schenault's bedroom. The room appeared to have been ransacked: the bedside dresser drawers were open, their contents were in disarray, the bedsheets, bedspread and pillows were strewn about the room and there was a trail of blood on the carpeting.

After returning to his office, Detective Flood spoke with an employee of Schenault, Lilly Lovett, who informed him that Deborah Weathersby was involved in the occurrence. Consequently, the detective conducted a name check on Weathersby and learned that she was wanted for questioning in another matter. Lovett also described a man who had come into the Schenault house: he was black, his hair was in a curly perm, he wore a short dark jacket and he had a big

gun with a long barrel. Lovett selected defendant's photo from among a group that Flood had shown her, but she said that she would have to see the person's build in order to be sure. On March 28, 1984, Flood went to the Metropolitan Correctional Center, from which he brought defendant to his office, and on that same day, Lovett picked defendant out of a lineup. The lineup photograph showed Montague to be 5 feet 7 inches tall, 140 pounds, with short hair and no mustache.

Lovett testified that prior to March of 1984, she had known Harry Schenault and Phyllis Alvarez for approximately two years; that she had known Schenault's driver, Ron Casey; that she had known Deborah Weathersby for about three months; and that Weathersby lived with her for three months immediately before the incident of March 21, 1984. Lovett then testified as to the events that occurred on that day.

She was at work, sitting on a bench near the wall, in Schenault's bedroom, when Weathersby entered the house. From where Lovett was sitting, she could see a hallway which led to the foyer and the front entrance. The door bell rang, and Alvarez answered it. Alvarez informed Schenault that it was Weathersby, and Schenault instructed Alvarez to let her in as he was expecting her. Lovett then heard Alvarez scream, "Oh no!" followed by two shots. After she had jumped up and gone to see where the shots had come from, Lovett saw defendant holding a gun and hovering over Alvarez with one arm around her. Lovett screamed, "It's a robbery!" and ran into the bathroom in Schenault's bedroom, out into the hallway and right into defendant, who was carrying a gun.

Lovett begged defendant not to shoot her and ran up the stairs towards Alvarez' bedroom. Defendant was following her, and she continued to beg him not to shoot her. Once inside Alvarez' room, Lovett had a clear look at defendant's face. When defendant left the room, she tried unsuccessfully to lock the door, so she broke the window with a hard book and went through it. Because she had heard gunshots and was bleeding, she thought she had been shot, but then realized that she had cut her back on the jagged edges of the broken window. After Lovett had gone through the window and onto the roof, she went to the Yates Avenue side of the house, where she saw Schenault walking down the street, bleeding from his face and leg. Because she had sprained her hip, the police had to climb to the roof to get her down. Lovett was then taken to the hospital where she received 22 stitches for her cuts.

Detective John Solecki testified that when he and his partner, Joseph DiGiacomo, arrived at Schenault's house on the day of the occur-

rence, other police officers were already on the scene, so they canvassed the area surrounding 80th and Yates attempting to find witnesses or information regarding the case. Eight days later, Solecki went to South Shore Hospital to show certain photos to Schenault. However, because Schenault was suffering from gunshot wounds, Solecki was unable to interview him. Solecki testified on cross-examination that he came to know Schenault in May of 1983 during his investigation of the murder of Ron Casey, and that the only eyewitness to that killing, Phyllis Alvarez, viewed two lineups regarding that case. Solecki stated that although arrests were made, defendant was not one of them, and no one was ever prosecuted for the Casey homicide.

Codefendant Deborah Weathersby, in testifying for the prosecution, admitted that she sold drugs for Schenault, that she agreed to testify against the defendant in return for a sentence of six years for home invasion, and that she had been in custody for more than two years at the time of her testimony in 1986. She stated that defendant was her boyfriend, that she knew Schenault in March of 1984, and that she had lived in his house at 80th and Yates from 1979 through 1981.

On March 21, 1984, at approximately 1 or 2 p.m., Weathersby walked to a grocery store on 81st and Cottage and met defendant and James Edens, whom defendant referred to as "Bob." Defendant told her that he wanted her to let them into Schenault's house; she agreed, so they went in Edens' orange Datsun to another store on 79th and Yates. Weathersby telephoned Schenault from the store and told him that she wanted to purchase a half-ounce of cocaine for $800 or $900 and that she was on her way over. Before the three left the store, defendant purchased a potato to silence his gun and put it in his briefcase. When defendant opened the briefcase, Weathersby saw some gray tape and a 30-30 sawed-off rifle that was approximately 14 to 16 inches long. While riding in the car to Schenault's home, she saw that defendant also had a .38 pistol.

When they arrived at Schenault's house, Weathersby and defendant, who had his briefcase and .22 pistol with him, went to the door. They rang the doorbell, and the housekeeper, Alvarez, let them in. After Lovett announced Weathersby to Schenault, Alvarez started up the stairs and defendant followed her. Next, defendant grabbed Alvarez around the head and Alvarez begged him not to kill her. Defendant then shot her in the head twice, and Alvarez fell to the bottom of the steps.

Defendant and Edens, who also had a gun out, then started up the stairs to Schenault's bedroom. After defendant went up the stairs,

Weathersby heard gunshots and a lot of noise, as if someone were running. She heard Lovett say, "Please don't shoot me, Deborah is my friend," and remembers hearing Edens tell defendant that they would have to leave because Schenault was on the phone calling the police. Weathersby then heard three or four more shots. When they got outside to the car, Weathersby heard defendant say, "We got the old man, but we didn't get the bitch."

Following the incident at the Schenault home, the three drove to defendant's aunt's house on the west-side of Chicago to hide out. After two or three days, Weathersby went to Detroit, where she stayed with another of defendant's aunts, and on April 2, 1984, she returned to Chicago and turned herself in to the police.

After the People rested their case, defendant made a motion for a directed finding, which the trial court denied.

Thereafter, at a conference held in the judge's chambers, and again at the close of the evidence, defense counsel objected to the jury's viewing three postmortem autopsy photographs, arguing that there was no issue regarding the cause of death and that the photographs were prejudicial. The court overruled the objection and allowed the jury to view the photos.

During rebuttal, the State argued, over defense counsel's objection, that defendant did not appear upset or remorseful, and that the jury should believe Weathersby because she had testified at an earlier trial and if her testimony were different, the defense would have impeached her. In moving for a mistrial, the defense contended that the State's remarks impermissibly shifted the burden of proof onto the defendant.

At the sentencing hearing, Detective Flood testified in aggravation that when he went to defendant's home shortly after the Alvarez murder, he learned when defendant was going to be at the Metropolitan Correctional Center to surrender himself as a result of his having been convicted of a Federal offense. The detective went to the center with a court order, took custody of defendant, and put him in a lineup. After Flood returned defendant to Federal custody, he was sent to Michigan and later extradited to the Illinois authorities in connection with their investigation of the instant case.

Officer James O'Rourke testified that at 7:30 p.m. on July 21, 1978, he went to 80th and Escanaba in response to a complaint that there were several armed men there in a car. When he arrived, O'Rourke observed a 1967 Pontiac with three black males inside, one of whom was the defendant. O'Rourke further testified that "defendant was the driver" and that he saw him throw a loaded .38 caliber

handgun from the car.

Joseph Smith testified that defendant took certain items from him at gunpoint at a carnival on September 24, 1976, and during the dispute, defendant shot Joseph twice in the genitals.

Defendant's Federal probation officer testified that defendant had been convicted of possession of a postal money order with the intent to counterfeit and was sentenced to a prison term of two years. This offense occurred while defendant was on probation for receiving and possessing a United States postal money order with intent to use it, knowing it to have been embezzled, stolen or converted.

In mitigation, defendant's mother testified that defendant was the youngest of five children and that he worked in his father's business until his father's death in 1984. Defendant's sister, Gloria, testified that the defendant helped her to raise her five children after she separated from her husband. Verna Jackson, who had known defendant for 14 years, testified that defendant had always helped her during her illnesses.

The jury declined to impose the death penalty. Accordingly, after hearing post-trial motions, the judge found defendant's behavior to be exceptionally brutal and heinous and that he acted with premeditation. As previously noted, he sentenced defendant to natural life in prison for murder, 30 years for attempt (murder), and 30 years for home invasion, all to be served concurrently.

I

Defendant first argues that the trial court improperly refused to permit him to introduce hearsay testimony regarding the Casey murder. Defendant charges that someone other than he had a strong motive to kill Alvarez, for, he reasons, since she was the sole witness to the earlier murder of Schenault's driver, Ron Casey, whoever murdered Casey could have killed Alvarez to prevent being identified by her. The trial court excluded such evidence several times, ruling that it was inadmissible as hearsay. The defendant stresses that the right to present a defense is fundamental to a fair trial, that he was denied this right and that he must therefore be granted a new trial. (*Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038.) Defendant adds that the evidence he sought to introduce was admissible for a nonhearsay purpose, one pertaining to the motive or state of mind of Alvarez' assassin; thus, he protests that Simpson, Lovett, and Solecki were prevented from testifying that Alvarez was a witness to the Casey homicide and had been threatened because she was a witness. Defendant further maintains that the trial judge's er-

ror was magnified when the prosecutor in summation argued that because defendant killed Alvarez, Casey's murderers went free inasmuch as the witness was dead. The prejudicial effect of excluding the proffered testimony as a theory of defense, defendant concludes, while allowing the State to challenge that theory in its rebuttal argument is manifest and a new trial must be granted.

We decline to make use of the bed of Procrustes upon which defendant takes his measure of this aspect of his trial. Professor Cleary informs us that "[a] statement expressing the declarant's then-existing state of mind *** such as intent, plan, motive, design, *** is admissible as a hearsay exception." (E. Cleary & M. Graham, Handbook of Illinois Evidence §803.4, at 554 (4th ed. 1984).) In his briefs filed in this court, defendant relies on two cases: *People v. Kline* (1980), 90 Ill. App. 3d 1008, 414 N.E.2d 141, and *People v. Shannon* (1986), 149 Ill. App. 3d 525, 501 N.E.2d 166. In *Kline* it was held that statements relating to proposed narcotics transactions were not hearsay when offered to establish the reasonableness of the defendant's belief that the decedents were armed and dangerous in support of his claim of self-defense. In *Shannon*, a witness was precluded from testifying that Ivanov had discussed with the witness on several occasions that he wanted to "get" the victim, who Ivanov believed was responsible for the killing of his brother. The defendant, at trial, claimed that it was Ivanov who shot the victim. The appellate court held, with one justice dissenting, that the exclusion of such testimony was error, but, in light of the overwhelming evidence of defendant's guilt, the error was harmless.

Because there appears to be some confusion on defendant's part regarding the events that transpired at trial in connection with the Casey matter, it might prove helpful to review the record.

The State's motion *in limine* was to prohibit the cross-examination of any witness "as to the homicide that occurred in May, 1983, as not probative of the facts before this court or jury." Defense counsel objected on the ground that the police were of the belief that Alvarez was "eliminated because she identified the three perpetrators." Defendant's objections were overruled, the court holding that defense counsel was "talking speculation, conjecture, and hearsay *** what I have heard so far, you have no witness that you are going to put on, or the State's going to put on that you can elicit critical, probative, relevant testimony to the murders of the people that killed Miss Alvarez, so I will grant the State's motion at this stage ***. If it arises during cross-examination of the witness, we will have a side-bar and you can raise the issue again." After the judge had characterized de-

fense counsel's objections to the motion *in limine* as an attempt to bring "speculation, conjecture, and hearsay" into the case, defendant's attorney responded, *"If I have to prove it up, I can prove it up by the officers."* (Emphasis added.)

Nonetheless, and as previously noted, defendant's counsel was permitted, over the State's objection that it was beyond the scope of the direct examination, to obtain from Detective Solecki testimony that he investigated the Casey murder and that Alvarez viewed two lineups in an attempt to identify Casey's assailant. But, when counsel asked Solecki if she viewed a third lineup, the State objected, and the objection was sustained. Defense counsel then asked Solecki if anyone was arrested after a third lineup was shown to Alvarez, and again the State objected, but before the judge could rule thereon, the State asked for a side-bar. At the side-bar the prosecutor complained that if defendant's attorney "wants to go into this, he should go into it in his case. He should call Detective Solecki as his witness"—and he characterized as calling for "blatant hearsay" counsel's asking if Solecki arrested anyone after Alvarez had viewed a lineup.

Because "this is going to come out anyway," the judge ruled, "I'm going to allow him to go into it. But, you can't get in any hearsay," and he overruled the State's objection. Thereafter, Detective Solecki testified that he did not arrest defendant Montague, that he did arrest two others, but that no one was "ever prosecuted on that case." On redirect, the prosecution brought out that Casey was killed in front of Schenault's house in May 1983, that the only eyewitness thereto was Alvarez, that Weathersby "had absolutely no connection, was never mentioned at any point in time with that 1983 homicide," that Lilly Lovett did not have anything "at all to do with it," and that there was no connection "whatsoever" between the Casey and the Alvarez cases.

On re–cross-examination, defense counsel was precluded from putting the following questions to Solecki, both of which were apparently cut short by the State's objections:

"On Mr. Casey's murder, if I'm correct, a woman gained entrance to Harry Schenault's house by—,"

and:

"Was the motive of the Ron Casey homicide to—."

Both objections were sustained and the jury was instructed to disregard the questions. No offer of proof was made by defendant, and contrary to his intent, as stated at the hearing on the State's motion *in limine* and at another side-bar when Alvarez' son Ray Simpson was on the witness stand, defense counsel called neither Solecki nor

any other police officer to testify.

The complaint that defendant makes here with respect to this issue as stated in his briefs is as follows: "The defense theory was that someone other than Montague had a strong motive to kill Alvarez. Alvarez had witnessed the earlier Casey murder, and could identify the perpetrators of that murder. The theory was that the men who killed Casey could have killed Alvarez to prevent being identified by her. It was critical to develop evidence that Alvarez was an eyewitness ***. The court erroneously excluded evidence from several witnesses pertaining to the perpetrator's motive, or state of mind. Simpson, Lovett and Solecki were prevented from testifying that Alvarez was a witness to the Casey homicide and had been threatened because she was a witness."

Defendant's complaint thus reduces itself to two points: one, that "the court excluded all testimony" that Alvarez was a witness to Casey's assassination, and two, that she "had been threatened because she was a witness." But defendant inexplicably ignores that Detective Solecki testified that Alvarez was not only a witness to Casey's murder, but that she was the only witness thereto. Accordingly, that fact was indisputably before the jury, and it was testified to authoritatively by the police detective who had investigated the Casey matter. As to defendant's claim that Alvarez had been threatened because she was a witness, we find in the record that in a side-bar while Alvarez' son, Ray Simpson, was on the witness stand, defense counsel informed the judge that he wanted to "not just show that she was killed because she was a witness to this case, that is not my theory of defense," but "to show this place, Harry's Castle was a dangerous place." The judge responded, "I don't think that is even contested by the State ***. I told you if you want to put in competent evidence to show that there is a homicide, some time prior to the date in question, it is somewhat probative to your theory of defense, I would let you do so, but the evidence has to be competent evidence." Defendant's counsel responded, "*I can do that by the detective.*" (Emphasis added.) And, as we have noted above, this is precisely what counsel was allowed to do. As to counsel's wanting to show that Schenault's "was a dangerous place," the State, as the judge observed, not only did not contest it, but defendant's attorney argued that point vigorously and in detail in summation. It simply was not an issue in the trial of this matter; indeed, the evidence thereon was plenary.

With regard to Lovett's testimony, here, in yet another side-bar, defense counsel admitted to the judge more than once that he did not know what her answers would be to his questions. Nevertheless, the

judge, although commenting that counsel would be "fishing," permitted him to interrogate Lovett outside the presence of the jury, and in response thereto, we learn that she knew that Casey was killed in a robbery attempt at Schenault's house in May 1983, but she was not present; that she heard that Phyllis was a witness to it and "that someone had put a hit on her or something"; that Alvarez' son had told her so; that she did not know if "the hit" was because Alvarez had identified Casey's killer; that she had "heard it both ways" but "I don't know anything about it." The judge continued the motion *in limine*, adding, "now you know this witness didn't see it."

Defendant argues that the trial court erroneously excluded evidence from these witnesses "pertaining to the perpetrator's motive or state of mind." Yet, the record clearly and unmistakably shows that all the evidence defendant needed in order to present the type of defense which he argues is sanctioned by *Kline* and *Shannon* was before the jury in the form of Solecki's testimony that, as the police detective who investigated the Casey homicide, he had Alvarez view at least two lineups; that he did not arrest Montague for that murder, although he did arrest two others; that the Casey murder had never been prosecuted; and that Alvarez was the only eyewitness to the Casey homicide. However, the only reference made to Solecki by the defense in summation was "he is the man that had been at Skinny's [Schenault's] house on the prior murder of Ron Casey less than a year before." Counsel had obtained evidence enough for the purpose of making the argument he desired to put to the jury as to his theory of the case, but for reasons best known to him he failed, neglected or refused to do so.

 Yet counsel complains that not only was the court's refusal to admit the so-called "state-of-mind" testimony "highly prejudicial, as it prevented Mr. Montague from presenting his theory to the jury," but "further, the error was compounded when the court allowed the State's Attorney to argue the excluded evidence"—all of which, we are constrained to point out, is sheer, arrant nonsense, for the prosecutor's references to the Casey homicide were firmly and correctly based on evidence, the admission of which was insisted upon by defendant. Accordingly, the prosecutor had the right to comment on that evidence and to draw all legitimate inferences deducible therefrom. (*People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 379 N.E.2d 847.) Defendant had the same right and the same opportunity; that he chose not to exercise them is a fault not attributable to either the State or to the judge. The jury, however, must have readily perceived why the State argued in rebuttal: "When [Montague] killed Phyllis Al-

varez, the three people that were accused of killing Ron Casey walked out the front door because the witness was dead." It just as readily and just as easily must have apprehended that the defendant deliberately shunned arguing his "theory of defense" for its sheer incredibility when they considered that the evidence as to identity was overwhelmingly and compellingly against him: Weathersby, as *particeps criminis*, gave a detailed account of her relationship with defendant and their participation in this whole sordid affair, including her observing defendant as he shot Alvarez in the head twice, and Lovett's having picked defendant's photo from an array shown to her by the police, her identifying him in a lineup, and her identifying him in open court. Both accounts, of course, are related above in more detail. That the State entered into a plea bargain with Weathersby; that she had been a drug peddler for Schenault, and had used drugs; that she had first told the police that "Bob" (Edens) shot Alvarez; that she had withheld mentioning that defendant was a participant in Alvarez' murder; and that she had been impeached in her testimony that she was not a prostitute before 1983, should afford no comfort to defendant, for it is by this time too well established to require any further elaboration on our part that this court is without a writ to reach the credibility issue which confronted the jury in this case. (*People v. Wilson* (1977), 66 Ill. 2d 346, 362 N.E.2d 291; *People v. Sumner* (1969), 43 Ill. 2d 228, 252 N.E.2d 534; *People v. Harvey* (1981), 95 Ill. App. 3d 992, 420 N.E.2d 645.) Consequently, we hold that the trial judge was eminently fair and just in his ruling as to defendant's "state-of-mind" issue.

## II

Defendant argues that the trial court wrongfully prevented defense counsel from impeaching key State witnesses against him, claiming that two prosecution witnesses accused him of the offenses charged and that the impeachment of each witness was crucial to his defense.

Defendant first contends that the trial court unduly restricted his counsel's cross-examination of Deborah Weathersby—specifically, that the trial court incorrectly disallowed the playing of a tape recording of her statement to the police. Defendant argues that Weathersby's demeanor during the making of this statement was critical to the determination of her credibility, especially since she first accused "Bob" (Edens) and later changed her statement and accused defendant. Defendant asserts that Weathersby's earlier demeanor was intimately relevant to her demeanor on the stand, as in both instances, she

swore she was telling the truth.

Second, defense counsel attempted to impeach Lovett through Flood with an omission in the description of the defendant that she gave to Flood and to show the extent of Lovett's opportunity to observe the offender. However, the court ruled that he could not lay a foundation through Flood, and although counsel made an offer of proof, the judge excluded the testimony on the ground that it did not constitute impeachment. Defendant claims that it is proper to impeach a witness by showing her failure to state a fact under circumstances where one would expect such a fact to be given. (*People v. Monroe* (1977), 66 Ill. 2d 317, 362 N.E.2d 295.) The defendant further avers that statements regarding the description of the accused are so significant that they are the proper subject of impeachment by omission. *People v. Gonzalez* (1983), 120 Ill. App. 3d 1029, 458 N.E.2d 1047, *aff'd* (1984), 104 Ill. 2d 332, 472 N.E.2d 417.

■ The State responds that defense counsel fully cross-examined Deborah Weathersby regarding her prior statements, thereby rendering the playing of her tape-recorded statement unnecessary. While the State acknowledges the defendant's right to confront the witnesses testifying against him (U.S. Const., amend. VI; Ill. Const. 1970, art. I, §8), it also points out that the right to conduct cross-examination is limited: the trial court has discretion to determine in criminal proceedings the parameters of permissible cross-examination, and its decision in this regard will not be disturbed on appeal unless the defendant establishes that such discretion has been abused and has resulted in manifest prejudice to him. *People v. Hunter* (1984), 124 Ill. App. 3d 516, 464 N.E.2d 659.

■ We conclude that the trial court correctly declined to permit defendant to play the tape recording of Weathersby's statement to the police for the record clearly reveals that she admitted on cross-examination that she gave such a statement and that in it she lied to the police. She also admitted that at the end of the recorded statement, she looked at the police and told them she was telling the truth. Although defendant seeks to make an issue of demeanor apropos a tape recording, we fail to be edified. In the ordinary legal sense, the demeanor of a witness refers to facial expressions, hand and other body gestures, or other physical indicia. We fail to perceive how any of these can be captured on tape; nor does our perception extend to the comprehension of how tone of voice alone, which is manifestly all a tape recording can offer the fact finder without the accompanying "body language," performs the function claimed for it by defendant. Moreover, defendant propounds no authority in support of the propo-

sition he advances here. More important, defendant overlooks that Weathersby, as we have noted above, had already been impeached by her admission that she had previously lied to the police. The evidence on the tape would be merely cumulative and would appear to add nothing to what was already before the jury.

■ The State maintains that the trial court properly denied defense counsel permission to impeach Lovett with an omission in her statement to Detective Flood because defense counsel did not lay a foundation for that purpose while cross-examining her. We find the trial court to have ruled correctly. Lovett testified that when he shot Alvarez, defendant had a permanent, a mustache, was wearing a dark jacket, was 5 feet 6 inches or 5 feet 7 inches tall, and weighed 140 or 150 pounds. But defense counsel did not ask Lovett what, if any, description she gave to the officers; accordingly, because he failed to lay the proper foundation, there was no testimony to impeach.

### III

■ Defendant argues that, over his objection, the trial court erred in allowing Officer Flood to testify that, during his investigation, he learned that defendant was in custody at the Metropolitan Correctional Center and that Flood interrogated him there, thus violating his right to a fair trial, requiring a reversal of the convictions. Defendant cites authority that when a jury hears evidence regarding the accused's previous contacts with the police or previous incarcerations, there is a real danger the jury will be biased thereby. *People v. Lampkin* (1983), 98 Ill. 2d 418, 457 N.E.2d 50.

■ The State responds that the defendant waived this issue by failing to raise it in his post-trial motion (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), ___ U.S. ___, 102 L. Ed. 2d 263, 109 S. Ct. 274), the purpose of which motion is to afford the trial court the opportunity to review and correct alleged errors that occurred at trial. (*People v. Myles* (1985), 131 Ill. App. 3d 1034, 476 N.E.2d 1333.) We agree. Defendant did not raise the matter in his post-trial motion; he has therefore waived it on appeal.

### IV

Defendant charges the prosecutor with improperly arguing that defense counsel would have impeached Weathersby with the testimony she gave in another trial if she were untruthful during defendant's trial. Defendant urges that this argument impermissibly suggested that the defense had the burden of proof in this case, citing *People v. Holman* (1984), 103 Ill. 2d 133, 469 N.E.2d 119, *cert. denied* (1985),

471 U.S. 1050, 85 L. Ed. 2d 342, 105 S. Ct. 2044.

■■ The State responds that the prosecutor's statement did not shift the burden of proof inasmuch as defense counsel had himself commented that Weathersby had lied to the police, and counsel continued throughout his closing argument to comment that she had lied and been impeached. Such tactics, the State adds, could be seen as inviting the prosecutor's response, maintaining that it is firmly established that remarks made by the prosecutor which might ordinarily be considered improper are permissible in rebuttal argument when they are invited by those made by defense counsel in his own closing argument. *People v. Sutton* (1977), 45 Ill. App. 3d 739, 359 N.E.2d 1132.

The State further refers to defense counsel's statement in his closing argument that Weathersby had more motive to lie than anyone else since a deal was made with her that after the trial was over, it would be recommended to the judge that she be sentenced to six years in the penitentiary. Thus, it concludes, the State's comment was invited and therefore not error.

There can be no question but that the prosecutor's rebuttal argument that the defendant could have impeached Weathersby was clearly invited by the defense's closing argument; therefore, it does not constitute error.

## V

Defendant next argues that the trial court erred when it allowed the jury to view autopsy photos of the victim when the cause of death was not in issue, thus denying his right to a fair trial (*People v. Fierer* (1987), 151 Ill. App. 3d 649, 503 N.E.2d 594, *aff'd* (1988), 124 Ill. 2d 176, 529 N.E.2d 972), and complains that autopsy photos are usually grisly scenes of the autopsy procedure itself and tend to arouse strong emotions.

■■ The State replies that the autopsy photographs were properly admitted, and we agree. It is firmly established that the admission of the photos of a murder victim is within the sound discretion of the trial court (*People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6), more particularly where they are relevant to establish any fact in issue, even where defendant does not refute the victim's identity or the cause of his death. (*People v. Kubat* (1983), 94 Ill. 2d 437, 447 N.E.2d 247, *cert. denied* (1983), 364 U.S. 865, 78 L. Ed. 2d 174, 104 S. Ct. 199.) Photographs of a victim are also properly admitted into evidence when they corroborate testimony as to the cause of death, the number and location of wounds and the manner in which they were inflicted. *People v. Williams* (1985), 137 Ill. App. 3d 736, 484 N.E.2d 1191.

In the case *sub judice*, inasmuch as the record shows that the photographs were admitted to corroborate testimony as to the number of gunshot wounds, the location of the wounds, and the gun that caused them, we find no abuse of the judge's discretion.

## VI

Defendant contends that his sentence of natural life imprisonment must be vacated because the trial court based his sentence on the erroneous finding that the offense was accompanied by brutal and heinous behavior, the court having invoked the provisions of section 5—8—1(a)(1)(b) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(b)) in order to do so.

The defendant argues that a finding that the killing was brutal and heinous requires evidence that the defendant's conduct was shocking and inhumane, something more than conduct that is associated simply with the act of killing. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344.) The defendant urges upon this court that his conduct was not the evil, grossly inhumane conduct which would support a finding that it was brutal and heinous, citing *People v. Holiday* (1985), 130 Ill. App. 3d 753, 474 N.E.2d 1280, in which the defendant robbed a dice game, killed one victim by shooting him twice, and wounded three others, and the court held that such conduct was not brutal and heinous. Defendant further argues that a sentence of life imprisonment does not comport with the mandate of our constitution that sentences be proportionate to the seriousness of the offense; nor is it, he claims, within the range of sentences that are generally imposed for similar offenses. Ill. Const. 1970, art. 1, §11.

We quite agree with the State that the defendant's sentence of life imprisonment was a proper exercise of judicial discretion inasmuch as the murder here was wantonly brutal and heinous. In *La Pointe*, the Illinois Supreme Court specifically found that the statute does not limit the imposition of a sentence of natural life imprisonment to only those murders involving torture or the infliction of unnecessary pain. The supreme court went on to hold in *La Pointe* that the defendant was properly sentenced to life imprisonment since the record indicated that he had a history of criminal activity, acted with premeditation and deliberation, and displayed a total lack of remorse. Similarly, in the case at bar, the defendant clearly acted with premeditation, deliberately and without remorse.

A trial court's decision with respect to sentencing is entitled to great weight and deference. (*La Pointe*, 88 Ill. 2d 482.) Furthermore, it is a well-settled principle of law that absent an abuse of dis-

cretion by the trial court, a sentence may not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Rather than having merely the "cold record" afforded to this court on appeal upon which to base the imposition of its sentence, the trial court is provided a much better opportunity to consider the many factors from which an appropriate sentence may be deduced. (*Perruquet*, 68 Ill. 2d 149.) Based on very much the same evidence, we said in the case of Montague's codefendant James Edens:

"[T]he trial judge made a specific finding that the offense in the instant case was accompanied by 'exceptionally brutal and heinous behavior indicative of wanton cruelty,' and he further found 'a total absence of remorse' on the part of the defendant. When we review the facts of this case in which the armed defendants fiendishly planned this robbery, savagely invaded a home in the middle of the afternoon, brutally shot Phyllis Alvarez, a victim who in no way antagonized the perpetrators of the crime or provoked the shooting, inhumanly terrorized Lilly Lovett, and mercilessly shot Harry Schenault, we cannot say that the judge abused his discretion in imposing an extended-term sentence upon defendant." (*People v. Edens* (1988), 174 Ill. App. 3d 1033, 1048, 529 N.E.2d 617.)

We can conceive of no reason to reach a different result here.

## VII

■■■ As his last issue, defendant argues that the delay of two years before he was brought to trial violated his right to a speedy trial. The Uniform Agreement on Detainers provides that when a person is in a penal or correctional institution of another State, and a case is pending against him in State court, the pending case must be tried within 180 days of the defendant's demand for trial. (Ill. Rev. Stat. 1983, ch. 38, par. 1003—8—9.) Article III(a) of the agreement sets forth that in order to activate its provisions, the defendant must provide the prosecuting officer and the appropriate court written notice of the place of his imprisonment and his request that a final disposition be made of the indictment. Ill. Rev. Stat. 1983, ch. 38, par. 1003—8—9, art. III(a).

The defendant claims that he demanded trial on April 19, 1984, when the case was called for arraignment, and that he further advised the prosecutor and the court that he was in Federal custody in Terre Haute. Defendant asserts that he was not present in court again until November 14, 1984, 211 days from the date he demanded trial. He stresses that although the case was continued by agreement

on November 14, 1984, and many times thereafter, the time period at issue is that from the demand for trial to the defendant's first appearance in court—which was a 211-day delay. Thus, he argues, his delay was well over the required 180-day period; accordingly, it violated his right to a speedy trial.

■■■ Defendant further asserts that his right to a speedy trial is also assured by the sixth amendment to the U.S. Constitution, and that the Supreme Court has specified that four factors need to be considered in order to determine whether that right has been violated (*Barker v. Wingo* (1972), 407 U.S. 514, 33 L. Ed. 2d 101, 92 S. Ct. 2182), namely: (1) the length of the delay, (2) the reason asserted for the delay, (3) the defendant's assertion of his right, and (4) the prejudice suffered by the defendant. (*Barker*, 407 U.S. at 530, 33 L. Ed. 2d at 117, 92 S. Ct. at 2192.) Defendant states that our supreme court has also adopted this test. *People v. Jones* (1984), 104 Ill. 2d 268, 472 N.E.2d 455.

His defense, he declares, was that he was not present at the scene and that he took no part in the incident. In his speedy trial motion, his counsel asserted that the defense was hindered by the delay, in that it engendered difficulty in obtaining the evidence needed to substantiate the alibi a year after the incident. In fact, defendant notes, no alibi witnesses testified. Defendant contends that a consideration of these factors in the context of the present case necessarily leads to the conclusion that he was prejudiced by the delay.

■■■ We agree with the State's position that the defendant's statutory right to a speedy trial was not violated. Defendant failed to activate the operational procedures set forth in the Uniform Agreement on Detainers, and such failure clearly precludes relief thereunder. (*People v. Uplinger* (1977), 69 Ill. 2d 181, 370 N.E.2d 1054.) In *Uplinger*, the trial court dismissed defendant's indictment for burglary because he was not properly advised of his right to demand trial or be brought to trial within 180 days pursuant to the provisions of the Uniform Agreement on Detainers. The State appealed and the appellate court found that the defendant did not qualify for protection under the 180-day rule. Defendant then appealed to the Illinois Supreme Court, arguing that he was entitled to protection because the warden did not inform him of his right to make a request for a final disposition of his case as mandated by section 3—8—9 (Ill. Rev. Stat. 1983, ch. 38, par. 1003—8—9, art. III(c)). The court held that the warden's failure to comply fully with the mandate of the agreement did not excuse defendant from invoking its provisions especially in light of the fact that both defendant and his attorney knew of this right.

In the case at bar, defendant was aware of his right and failed to invoke it, having never filed written notice with the prosecutor's office or with the court. Consequently, the defendant waived the right.

As to defendant's claim that his constitutional right to a speedy trial was violated, he fails to set forth any evidence whatsoever that his defense was hindered by the delay. We are told of no alibi witnesses that would have been produced had the trial been held earlier, nor are we given any information at all regarding where defendant claims to have been, or whom he was with at the time in question. All we are furnished is the bare conclusion that had there not been a delay of one year, the defendant would have had an alibi. This unsupported allegation does not amount to proof of a violation of the defendant's constitutional right to a speedy trial. The evidence of defendant's guilt is, as we have already noted, quite ponderous, and after examining the requisite factors, it is clear to this court, as it was to the trial judge, that the defendant's constitutional right to a speedy trial was not violated.

Affirmed.

BILANDIC, P.J., and HARTMAN, J., concur.

